THE STATE ex rel. BOARD OF CONTROL OF ST. LOUIS SCHOOL AND MUSEUM OF FINE ARTS v. CITY OF ST. LOUIS.

In Banc, January 5, 1909.

1. **EDUCATIONAL CORPORATION: Creation of Separate Corporation: Museum of Fine Arts.** Washington University, itself a creature of statute, had no power to create another corporation, namely, the Board of Control of the School and Museum of Fine Arts, nor did it attempt, by its ordinance of May 22, 1879, to make said Board of Control a separate corporation, but the purpose of that ordinance was to establish an agency of the University to manage and control the art department in the University, and to avail itself of the endowment created by Wayman Crow and other charitable benefactors of the art museum.

2. **PRIVATE CORPORATION: Changed to Municipal Institution: Art Museum.** A city ordinance whose title is, "An ordinance authorizing the erection in Forest Park of a building devoted to the purpose of art education," and whose first section reads, "The Board of Control of the St. Louis School and Museum of Fine Arts, a department of Washington University, are hereby authorized to erect within Forest Park in this city a building which, together with the site upon which it is located, shall be devoted to the use of this institution forever for the exhibition of pictures and sculpture and such other means as are usual in such institutions for the education of the public in art," did not change the Board of Control, which at the time was an agency of Washington University, a private corporation, into a public municipal institution of the city, nor render it independent of the University. The ordinance, recognizing the existence of a department of art in the University, expressed a permit to the University to erect a building in Forest Park to be used as an art museum, but did not endow the Board of Control with corporate powers not already possessed by it.

3. ————: ————: ————: **Aided by City Officers as Direc-
tors.** Nor did the fact that the ordinance augmented the Board
of Control of the Art Museum by the Mayor, Comptroller and
Park Commissioner, change the Board of Control from a pri-
vate administrative agency into a public municipal body. The
addition of those officers to the Board of Control did not have
the effect of changing the charter and by-laws of the Uni-
versity or the by-laws of the Board of Control adopted under
the powers granted to it as an agency of the University.

4. ————: ————: ————: **Estoppel.** Nor can a new cor-
porate or public municipal institution be deduced, by way of
estoppel, from the fact that the city ordinance permits the erec-
tion of a building in Forest Park, which, when erected, is to be
the property of the city, and from a subsequent submission to
and approval by the voters of the city of a proposition to levy
a tax sufficient to support the art museum in pursuance of a
statute authorizing the city to levy the tax.

5. ————: ————: **By Legislative Act.** A legislative act which
places an art museum under the control of an administrative
board created as an agency of a university to administer its
art department and fund, and continues said board with power
of self-preservation, and vests in said private board power to
receive taxes and expend them without liability to the city
authorities for their proper disposition, and withholds from the
city's corporate authorities power to regulate and control the
art museum, does not make of said board a separate legal en-
tity distinct from the University which had created the board
in the first instance and which under its organization has re-
tained control over it, even though the people vote the tax
contemplated by the act for the support of the museum.

6. ————: ————: **Right to Demand Taxes: Public Purpose.**
A board of control of a school and museum of fine arts, which
has been established by a university as its agency to administer
a fund created by private benefactions, and which is not a
corporate body or legal entity in and of itself, and does not
constitute one of the municipal institutions of the city, can-
not demand of the city moneys levied and collected as taxes,
which were levied after the voters at a special election had
approved of the legislative plan to levy and set apart a certain
tax for the support and maintenance of said art museum, nor
has it the right to disburse and expend said moneys on its own
vouchers. The Constitution says that "taxes may be levied and
collected for a public purpose only," and taxes which are to be
turned over to a private corporation to be spent by its board
upon its vouchers, are not levied or collected for a public pur-
pose, though its board uses them wholly to supply and main-
tain a museum of fine arts open and free to the public.

State ex rel. v. St. Louis.

7. **TAXATION: Disbursement: Public Officers.** The Constitution means that taxes when collected are to be administered and disbursed only by public officers elected or appointed according to law, whose accounts may be from time to time investigated by the lawful authorities.

8. ———: ———: ———: **Municipal Taxes: For Private Corporation.** The Constitution also means that municipal corporations are authorized to levy and collect taxes for municipal purposes only, and that municipal enterprises are to be conducted and controlled in fact by such municipalities by and through their proper officers, and that no municipality is authorized to exact taxes and turn them over to a private individual or to a board of a private corporation to be disbursed at their discretion.

9. ———: ———: **Power of Legislature: Aid to Corporation.** Under section 46 of article 4 of the Constitution of 1875, the General Assembly has no power to authorize any city to lend its credit or grant public money or thing of value in aid of or to any individual, association or corporation whatsoever, whether it be a public or a private corporation.

10. **OFFICERS: Appointed by Legislature.** The Legislature has no power to both create an office and appoint the officer itself, or designate what persons shall be appointed. The Legislature had no authority to both constitute the Board of Control of the St. Louis School and Museum of Fine Arts a separate municipal legal body, and to name the individuals then constituting said board as its first officers.

### Mandamus.

PEREMPTORY WRIT DENIED.

*Bond, Marshall & Bond* for relator.

(1) 1. Relator is not a department of Washington University, but is a separate, legal entity, constituted by the Act of March 7, 1907, and the action of the people of St. Louis, and is the first board of control provided for by that act. 2. The Act of March 7, 1907, created the office and designated how it should be filled, and as the office is not one provided for in the Constitution of Missouri, it was the province and duty of the Legislature to "provide for" the filling of the office, under section 14 of art. 9 of the Constitution. State Revenue Agent v. Hill, 70 Miss. 106; Kavanaugh v. State, 41 Ala. 399; Patton v. Board of Health, 127

Cal. 388; State v. Spaulding, 102 Iowa 639; State v. Cobb, 2 Kan. 27; Miller v. Warner, 42 N. Y. (App. Div.) 208; Jones v. Hobbs, 4 Baxt. (Tenn.) 113; State v. Finn, 8 Mo. App. 208; Mechem's Public Office and Officers, sec. 1; State v. Valle, 41 Mo. 31. 3. The Legislature has control over the revenues of the city. State v. Board of Education, 141 Mo. 50; State ex rel. v. Field, 119 Mo. 614; State ex rel. v. Owsley, 122 Mo. 68; State ex rel. v. Mason, 155 Mo. 499; State ex rel. v. Mason, 153 Mo. 43. 4. "As the Legislature represents the public interest, and has full control of all municipal organizations as instrumentalities of government, this branch of the State sovereignty may, unless restrained by constitutional provision, create such municipal offices as it thinks the public interests require, and fill them with any persons selected for the purpose." In re Senate Bill, etc., 12 Colo. 188; Com. v. Plaisted, 148 Mass. 375; People v. Draper, 15 N. Y. 532; Harris v. Wright, 121 N. C. 172; Phila. v. Fox, 64 Pa. St. 169; State v. Von Baumbach, 12 Wis. 310. The museum of art in Forest Park is a municipal institution, created by the ordinance of the city of St. Louis (ordinance 19969), by the will of the people speaking through the Legislature (Act March 7, 1907), and by the voice of the people of the city of St. Louis, at the election held April 2, 1907, by a vote of 27,771 in favor thereof and only 7,606 against it, and defendant admits in its return that it is "a public, municipal institution." St. Louis Co. Ct. v. Griswold, 58 Mo. 198; Throop on Officers, sec. 85. (2) Ordinance 19969 is not illegal or void. 1. The ordinance does not authorize Washington University to use the Art Building, and the University has nothing to do with it, and no power over it. The University is trustee of the property, pictures, art exhibits and of the endowments and trust estates, but the beneficial use is vested in the Board of Control, and the University has no power over it except to see that the trust property, the use

and possession of which is in the Board of Control,
is not lost or misappropriated, and that the income,
earnings and interest arising from the trust invest-
ments are properly applied, and that the principal
remains intact. In other words, the University is sim-
ply a trustee, and has only the power of a trustee.
2. Since the passage of the Act of March 7, 1907, and
the vote of the people on April 2, 1907, and the ac-
ceptance by the Board of Control of the provisions of
that act, and the expressed will of the people,
the Board of Control has been and is a sep-
arate legal entity, an administrative, municipal
board, charged with the duty of administering a munic-
ipal charity. 3. The Art Building is public; the use
to which it is put is public; and a building in a park
is a proper park purpose. State ex rel. v. Schweickardt,
109 Mo. 510. (3) The use contemplated by the Act of
March 7, 1907, is a public use. 5 Am. and Eng. Ency.
Law (2 Ed.), 897; Beach on Trusts and Trustees, sec.
320; People v. Coggswell, 113 Cal. 129; Price v. Max-
well, 28 Pa. St. 35; Russell v. Allen, 107 U. S. 163;
Mo. Hist. Soc. v. Academy of Science, 94 Mo. 459.
(4) The use being public, it can be administered by
any instrumentalities the Legislature may designate,
and relator is, *pro hac vice,* a municipal board, specially
created for the purpose of administering the public
charity, and the museum is a municipal institution, and
its location in Forest Park is a legitimate and proper
use of the park. But even if this was not true, the
use being public, it may be administered by a private
hand. 5 Am. and Eng. Ency. Law (2 Ed.), 895; Salton-
stall v. Sanders, 11 Allen (Mass.) 456; Donohugh's
Appeal, 86 Pa. St. 312; Bullard v. Chandler, 149 Mass.
532; Chambers v. St. Louis, 29 Mo. 543; State ex rel.
v. Powers, 10 Mo. App. 263; Chapin v. School District,
35 N. H. 445; Wetmore v. Parker, 52 N. Y. 450; Chapin
v. School District, 3 Ohio Dec. 321; Jones v. Haber-
sham, 3 Woods 443 (affirmed 107 U. S. 174); First Con-

gregational Society v. Atwater, 23 Conn. 35; City of Louisville v. University of Louisville, 54 Ky. 642; Succession of Auch, 39 La. Ann. 1043; Sohier v. St. Paul's Church, 53 Mass. 250. And a devise or gift for public charitable uses to be held by trustees or to a corporation to be incorporated by the Legislature, composed of the officers designated in the will as trustees, to take the estate and execute the trust, is a valid charitable use and may be administered in the manner stated. Inglis v. Sailor Snug Harbor, 28 U. S. 99; Ould v. Washington Hospital, 95 U. S. 303; Russell v. Allen, 107 U. S. 163; Jones v. Habersam, 107 U. S. 174; Field v. Drew Theological Seminary (C. C.), 41 Fed. 371; Coit v. Comstock, 51 Conn. 352; Milne v. Milne, 17 La. 46; Shapleigh v. Pilsbury, 1 Maine 271; Penoyer v. Wadhams, 20 Ore. 274; Dodge v. Williams, 46 Wis. 70. (5) The Act of March 7, 1907, does not violate sections 46 or 47 of article 4, or section 6 of article 9 of the Constitution. State v. University, 57 Mo. 178; State ex rel. v. Ziegenheim, 144 Mo. 283; County Court of St. Louis County v. Griswold, 58 Mo. 175; Jarrold v. Moberly, 103 U. S. 580. (6) The Act of March 7, 1907, does not violate sections 53 or 54 of article 4, or section 7 of article 9 of the Constitution. The act is not a Special Law. It applies to all cities which now have or may hereafter have four hundred thousand inhabitants. State ex rel. v. Miller, 100 Mo. 439; Lynch v. Murphy, 119 Mo. 163; State ex rel. v. Wofford, 121 Mo. 61; Dunne v. Railroad, 131 Mo. 1; Kansas City v. Stegmiller, 151 Mo. 189; State ex rel. v. Mason, 153 Mo. 52; State ex rel. v. Mason, 158 Mo. 486.

*Charles W. Bates, Benjamin H. Charles, Charles P. Williams* and *A. H. Roudebush* for respondent.

(1) The generally understood and accepted law in this commonwealth at the time the Constitution of 1875 was framed. 1. Taxes must be for a public purpose. Loan Assn. v. Topeka, 20 Wall. 665; Hilliard on Taxa-

tion (1875), sec. 17, ch. 1; Allen v. Jay, 60 Me. 124; In re Mayor, 11 Johns. 80; Sharpless v. Mayor, 21 Pa. St. 167; Grim v. Weissenberg, 57 Pa. St. 433; Curtis v. Whipple, 24 Wis. 350; Bank of Cleveland v. Iola, 9 Kan. 689. 2. It was clearly understood that the terms ''company, association or corporation,'' in article 11, section 14, of the existing Constitution of 1865, included all kinds of agencies, no matter how public, and even the State University. State v. Curators, 57 Mo. 178. 3. It was the settled law that no town or city had any power to make any grant of aid in favor of any association, individual or corporation, unless such town or city had been clearly empowered so to do by its charter or by the Legislature. Hitchcock v. City, 49 Mo. 484. The provisions of the Constitution of 1875, art. 4, secs. 45, 46, 47, 49; art. 9, sec. 6; art. 10, secs. 1, 10, 17; art. 14, sec. 11. The meaning and intent of these provisions taken together, is plainly to forbid a city from granting money or property or thing of value to or in aid of any individual, association, corporation, college, institution of learning or other institution whatsoever, whether created for, or to be controlled or administered by the State or any other person whatsoever, except the municipal corporation itself. (2) It is immaterial that the proposed beneficiary is a public charity, unless it be one which is a municipal institution, controlled and administered by the municipality itself. State v. Curators, 57 Mo. 178; Tyssen on Charitable Uses, p. 33; State ex rel. v. Switzler, 143 Mo. 287; State ex rel. v. Orr, 50 La. Ann. 887; Jeanes' Estate, 3 Pa. Dist. Rep. 314; Constitution of 1875, art. 4, sec. 47; State ex rel. v. Ziegenhein, 144 Mo. 283; Laws 1903, p. 279; In re Douglas, 35 Ch. Div. 472; Garrison v. Little, 75 Ill. App. 402; State ex rel. v. Seibert, 123 Mo. 424; Jenkins v. Andover, 103 Mass. 94; St. John's College v. State, 15 Md. 375; Sharpless v. Mayor, 21 Pa. St. 169; State v. County Court, 142 Mo. 584; Kingman v. Bracton, 153 Mass. 255. (3)

The Board of Control of the St. Louis School and Museum of Fine Arts was originally and is now a private association—the mere creature and appanage of Washington University, a private corporation, and neither Ordinance 19969 nor the Statute of 1907 ef-. fected any change in its character. Regents, etc., v. Williams, 9 Gill. & John. (Md.) 365. (4) The Ordinance 19969 (supposing it were valid), does not effectuate this change. 1. By its express terms the ordinance makes the grant to the board, as being a department of Washington University. St. Mary's School v. Brown, 45 Md. 329. 2. It is not pretended that Washington University nor any one else has complied with the ordinance. (5) Ordinance 19969, upon which relator relies, is void: 1. Because it is in violation of constitutional provisions prohibiting the granting of anything of value to any person, association, corporation or institution whatever. 2. Because the city has no power or authority to require the performance of private duties of public officials, the Constitution prohibiting the city from being jointly interested with others in any enterprise. 3. Because under the charter of St. Louis the control of public parks is a duty cast upon the Park Commissioner, and the power and duty to regulate the same cast upon the Municipal Assembly, whereas this ordinance attempts to turn over all control of this building and its affairs, and the regulation thereof, and the site upon which it may be erected, to a private board. Charter, art. 8, secs. 1, 2 and 4; art. 3, sec. 26, par. 3; art. 4, sec. 39. 4. Because it is repugnant to the charter of the city in that (a) it contains more than one subject, and (b) the subject-matter of the ordinance is not clearly expressed in its title. Charter, art. 3, sec. 13; Kansas City v. Payne, 71 Mo. 162; State ex rel. v. St. Louis, 161 Mo. 386; Sutherland, Stat. Const. (1 Ed.), sec. 78; Moses v. Mayor, 52 Ala. 198; Shively v. Lankford, 174 Mo. 545; State v. Persinger, 76 Mo. 346; In re Goode, 3 Mo. App. 230;

In Matter of Paul, 94 N. Y. 497; 27 Am. and Eng. Ency.
Law (2 Ed.), 580, 589, 590. (6) The Act of 1907 is
a local and special law, contrary to article 4, sections
53 and 54 of the Constitution. It purports to legislate
for a general class, whereas it subdivided this class in
many particulars. State v. Messerly, 198 Mo. 351.
(7) If the persons designated in the "unless and ex-
cept" clause of section 3 of the Act of 1907 are public
municipal officers, the statute is void as attempting by
the same legislative act to create and appoint officers.
State ex inf. v. Washburn, 167 Mo. 680; Mechem on
Public Officers, secs. 104 to 107, incl. (8) The Statute
of 1907 is void as being in contravention of section 7
of article 9 of the Constitution of Missouri: 1. It at-
tempts to create a new class of cities, to-wit, those of
over four hundred thousand inhabitants. 2. It at-
tempts to create new classes of cities, viz.: those that
accept the option of availing themselves of the statute,
and those that do not. 3. It undertakes to classify
cities into those having a private museum, and those
not having one, making a different law for each class.
Owen v. Baer, 154 Mo. 434; State ex inf. v. Borden,
164 Mo. 221; State v. Dorr, 145 Mo. 466; Murnane v.
St. Louis, 123 Mo. 479; Kansas City v. Scarritt, 127
Mo. 642. (9) If this Board of Control, having the
power of eternal self-perpetuation, is a public, munic-
ipal body, then section 3 is void because it violates
the fundamental axiom of our government that "all
political power is vested in the people." To grant this
power would take away from the great body of the
people the right to choose and elect those by whom they
shall be governed. Constitution of Missouri, art. 2, sec.
1. (10) "The Board of Control of the St. Louis School
and Museum of Fine Arts" has no legal capacity as
such to sue as relator or otherwise, because it is not a
legal entity, but is a mere agency of Washington Uni-
versity, and is not the real party in interest. Buckley
v. Big Muddy Iron Co., 77 Mo. 105; 15 Ency. Pl. and

Pr., 476; Lilly v. Tobbein, 103 Mo. 486; Riffe v. Proctor, 99 Mo. App. 607; Dicey on Parties, p. 147; Cooper on Eq. Pl., p. 146; Barbour on Parties, p. 381; Lloyd v. Loaring, 6 Vesey, Jr., 773; Littleton v. Wells, 98 Md. 455; Tunstall v. Wormley, 54 Tex. 481; Adams Express Co. v. Railroad, 126 Mo. App. 471; Railroad v. Amalgamated Soc. Ry. Servants (House of Lords, App. Cas. L. R. 1901), 429; Heath v. Goslin, 80 Mo. 316; Hajek v. Bohemian Slavonian Benevolent Soc., 66 Mo. App. 568; Phoenix Insurance Co. v. Burkett, 72 Mo. App. 1; Blakeley v. Bennecke, 59 Mo. 193; Methodist Episcopal Church, South, v. Clifton, 78 S. W. 732.

GANTT, J.—This is an original proceeding in this court to obtain a peremptory writ of mandamus directed to the city of St. Louis, commanding it and its proper officers and agents to draw proper warrants against what is termed the Art Museum Fund, collected and to be collected under the Act of the General Assembly of Missouri, of March 7, 1907, and now in the treasury of said city, upon vouchers of the relator, and to require said city, in fixing its tax rate in the future, to include therein an annual tax of one-fifth of a mill on the dollar for the benefit of relator.

The return was made on the day fixed by this court and a reply to that return was duly filed. Thereupon Hon. Theodore Brace was appointed to take the proofs and make return thereof to this court. In due time the commissioner took and filed his report of the evidence and exceptions were filed. Upon the pleadings and evidence the cause was argued and submitted upon full briefs.

The petition of the relator is perhaps as succinct a statement of relator's claim as can be made. It alleges in substance that: the St. Louis School and Museum of Fine Arts was established about the year 1874, and had continuously been maintained and conducted as a voluntary association, supported by pri-

vate contributions and endowments; that in the year 1879 Wayman Crow erected, at Nineteenth and Locust streets in said city, at his own cost, a museum building valued at $143,000, and conveyed the same in trust with the right of relator to use the same upon condition that $25,000 be raised as an endowment fund; that said condition was complied with, and the income from said sum has been used for the support of "such institution;" that other endowments have since been added, until on March 13, 1900, there was used and employed in and about said business and the educational features thereof property of the value of $1,250,000; that prior to March 13, 1900, said School and Museum of Fine Arts was largely conducted and operated as a public and free educational institution, and all of the revenues derived in any manner therefrom were used, devoted and employed for the maintenance and support of said School and Museum of Fine Arts, and none of them were or are used for profit or gain. That on March 13, 1900, the respondent city passed Ordinance 19969, entitled, "An ordinance authorizing the erection in Forest Park of a building to be devoted to the purposes of art education;" that section 1 of said ordinance provided that the Board of Control of said School and Museum of Fine Arts were authorized to erect within Forest Park a building which, together with the site upon which it is located, shall be devoted to the use of the institution forever, for the exhibition of pictures and sculpture, etc.; that section 2 provided that the location of said building should be determined by said Board of Control; that section 3 provided that said building should be erected subject to the conditions and provisions that when completed the building should be the property of the city for the uses hereinafter provided and no other; that "the building and its affairs shall be under the direction and jurisdiction of the Board of Control of the School and Museum of Fine Arts, augmented by the

Mayor, Comptroller and Park Commissioner of the city of St. Louis, who shall be ex-officio members of such Board of Control of said building;'' that there should be an exhibition of pictures and sculpture in said building Sunday afternoons from one o'clock to sundown, "and such exhibitions shall be opened free to the public as much oftener as in the opinion of te Board of Control the financial condition of the institution will permit.'' That relator accepted the provisions of said ordinance and said Board of Control was thereafter organized as required by the ordinance with the addition of the Mayor, Comptroller and Park Commissioner; that the relator selected as the location a certain place in said park now known as ''Art Hill,'' and that when relator was about to begin the erection of such building the respondent authorized the Louisiana Purchase Exposition Company to use a large part of Forest Park, including the site so selected by relator, for the St. Louis World's Fair; that a part of the arrangement between said Exposition Company and the respondent provided that after the Fair the buildings erected therefor should be removed by the Exposition Company, and the park restored to its former condition; that among the buildings erected by the Exposition Company was what is commonly known as the ''Art Building,'' which was erected upon the site selected by the relator for said museum building, and was constructed in a substantial, durable and fireproof manner, so as to safeguard the valuable works of art that were contributed, loaned and used at said World's Fair; that said building, erected at a cost of between $750,000 and $1,000,000, is of great value and appropriate for use by relator as a school and museum of fine arts as contemplated by Ordinance 19969; that pursuant to said arrangement with the city the Exposition Company has removed all of the buildings erected by it, except said Art Building, but that instead of removing it the Exposition Company, by

and with the knowledge, consent and acquiescence of the respondent, has permitted the relator to take possession of said building, prior to March 7, 1907, and to continue to occupy and use the same ever since, for the purpose specified in Ordinance 19969, on the agreement that when the affairs of said Exposition Company are finally wound up it will convey to the relator for the city of St. Louis, all its right, title and interest in and to said building, and the same will be considered as in all things full compliance by relator with the provisions of Ordinance 19969, and will be used by relator for the purpose therein specified, and the said building will become the property of respondent for the purposes specified in said ordinance; that ever since possession of said building was turned over to relator it has occupied and used the same for said purposes; that prior to and on March 7, 1907, said School and Museum of Fine Arts was so constituted and in existence; and respondent had a population of more than 400,000 inhabitants; and there was already constituted and in existence, operation and authority, an administrative board endowed by ordinance and other legal authority with power to occupy and administer public property devoted by law to the use of an art museum located in a public park by virtue of municipal authority; that the park herein referred to is Forest Park; that the property devoted to the uses of an art museum is the building aforesaid, and that relator constituted the said administrative board endowed by city ordinance with power to administer said property and said museum. That at its forty-fourth session the General Assembly passed an act entitled, "An Act providing for the establishment, extension and regulation of museums of art in cities of 400,000 inhabitants or more, or which may hereafter have 400,000 inhabitants or more, and authorizing taxation for the same, with emergency clause," approved March 7, 1907; that by section 1 of said act it is provided that when one

hundred taxpayers of any city now having or which may hereafter have 400,000 inhabitants or more, shall petition the proper authority for an annual tax of one-fifth of a mill on the dollar to be levied on all taxable property in such city for the establishment, maintenance or extension of a museum of art for the benefit of the public in such city, such question to be submitted to the voters thereof, the proper authorities shall give notice, etc., and if the majority of all votes cast upon such proposition shall be for the tax it shall be levied and collected as other general taxes in said city, and the proceeds thereof shall be known as the "Art Museum Fund," and the officials whose duty it is to fix the tax rate for such city shall so fix the same that, with and including such Art Museum tax, the constitutional limitation upon the taxing power of such city should not be exceeded.

The petition then alleges that the proposition for the levying of such annual tax for "the Museum of Art for the benefit of the public in such city, to-wit, for the School and Museum of Fine Arts aforesaid," was duly submitted at the regular city election held in said city in April, 1907, and more than a majority of all the votes cast upon such proposition were cast in favor of such art museum tax. That thereafter in fixing the tax rate the officials whose duty it was to fix the same, included in the rate for the year 1907, the tax of one-fifth of a mill on the dollar for said Art Museum, and that the constitutional limitation upon the taxing power of said city was not exceeded; that said art museum tax was extended in the proper tax book separate from city taxes, and that prior to February 1, 1908, the collector had collected and paid into the city treasury on account of said Art Museum tax levied for the year 1907 the sum of $88,214.54; that said sum stands in the treasury of respondent to the credit of "The Art Museum Fund," and that under section 5 of the Act of March 7, 1907, aforesaid, the

exclusive control of the expenditure of said fund is
vested in relator and said fund cannot legally be used
for any other purpose than for said Art Museum.
That after it had been decided by the voters that said
tax should be levied, relator, being in existence and
already constituted an administrative board endowed
by city ordinance with power to occupy and administer
public property devoted by law to the use of an Art
Museum located in a public park upon public property
by virtue of municipal authority, became, by section 3
of said Act of 1907, the first administrative board to
administer said trust and charity and to control the
expenditure of the Art Museum Fund, "and such board
and its successors became thereby *ipso facto* a legally
constituted entity with power of succession for all pur-
poses and possessing all the powers and charged with
all the duties provided for such board under the Act
of March 7, 1907, aforesaid." That after said vote
relator accepted the provisions of said act and qual-
ified thereunder and ever since has been managing,
controlling and administering the trusts and duties
imposed by said act, and are using, managing and
employing said art building in Forest Park, and all of
the property used by St. Louis School and Museum
of Fine Arts, with all the pictures, statuary, etc.,
provided for in said act, and in general for the promo-
tion of all proper means of aesthetic or artistic educa-
tion; that the galleries are open free to the public
under proper and reasonable regulations during suit-
able hours for a reasonable number of days each week,
including Sundays and public holidays; that the same
has been continuously used by great numbers of the
people of St. Louis; that said Art Museum "is one of
the largest, most complete and valuable art museums
in the United States;" that an admission fee is charged
on days when the museum is not so kept open to the
public and all revenues from donations and endow-
ments are used and employed solely for the benefit

of said galleries and collections, or other proper work of the institution, and no part is used for profit or gain; that said museum is used solely and purely as a free public educational charity, all as provided in said Act of 1907. That relator accepted the provisions of the Act of March 7, 1907, and ever since has been using "all the revenues of said property," etc. That notwithstanding the premises respondent, its officers and agents have failed and refused to pay properly authenticated vouchers drawn by the relator for the maintenance of said Art Museum, and although demanded by relator, they have refused and do still refuse to pay any of said tax so levied and collected for the maintenance, support or use of said Art Museum, and in all other respects refuse to observe any of the duties imposed upon them by said Act of March 7, 1907, and by the vote of the people under said act.

The city's position likewise is clearly indicated in its return which admits the establishment of the St. Louis School and Museum of Fine Arts in the year 1874, but alleges that "it was established by and as a school in and a department of Washington University, a corporation created by special acts of the Legislature," and that said St. Louis School and Museum of Fine Arts has always been and now is a school in and a department of said university. Denies that relator is a voluntary association, and alleges that the members of said board are officers and agents of said university in the conduct of said department thereof, and that the relator has not the legal capacity to sue, and no legal right, title or interest in the subject-matter of this action, other than as such officers and agents of said university. Admits that the Board of Control has the right to use the collection of works of art mentioned in the alternative writ, but alleges that it has such right only as officers and agents of the said university, in charge of it and under its direction. Admits that in 1879 Wayman Crow con-

veyed the real estate and erected the building thereon mentioned in the writ in trust to be used for the St. Louis School and Museum of Fine Arts; that the endowment of $25,000 was established, but alleges that said Wayman Crow conveyed said property to Washington University for the purpose, as expressed in his deed, of establishing and maintaining a department of art in Washington University, which said department of art in said university is the St. Louis School and Museum of Fine Arts. Admits that other endowments have been bestowed upon the trust as stated in the writ, but alleges that the same were granted and bestowed upon Washington University in trust for its said department, known as the St. Louis School and Museum of Fine Arts. Denies that said property or any part thereof of the said St. Louis School and Museum of Fine Arts was, prior to March 13, 1907, or at any time, conducted as a public and free educational institution, and alleges that ever since its existence it has been and now is conducted and operated by Washington University as one of its departments. Admits that the revenues derived from the said St. Louis School and Museum of Fine Arts are devoted and employed for the support thereof and not for profit.

Alleges that Washington University was incorporated by special acts of the Legislature of February 22, 1853, and February 12, 1857, entitled respectively, "An Act to incorporate the Eliot Seminary," and "An Act to amend an Act entitled 'An Act to incorporate the Eliot Seminary.'" That by the former act certain parties and their successors were constituted a body corporate and granted power of taking, holding, managing, leasing and conveying real and personal property for the support of said seminary, or the promotion of its objects, and its said property was exempted from taxation and the management of its affairs was vested in a board of seventeen directors, with power in said board to fill all vacancies therein, and with power

in said board to prescribe the course of instruction, organize the institution, and to provide for the appointment of its officers, teachers, and other officers, and make by-laws and rules for the management of said institution; that by the latter act the name of Eliot Seminary was changed to Washington University, and instruction sectarian in religion or partisan in politics was prohibited; that all highways running through the land owned by said university were vacated, and the city and county of St. Louis were prohibited from ever opening any highways through the same without the consent of the Board of Directors of said University. Respondent further alleges that many donations and things of value have been given to said university, or in trust for said university, to be used by it in carrying out the purposes of its incorporation, and that neither said university, nor its Board of Directors has the power or authority to abdicate its management of any of its schools or departments, without violating its charter powers, and without violating the contracts under which it received donations and assistance in its educational work, and as the managers of the said university.

Admits the passage of Ordinance 19969, and sets the same out in full. The title of said ordinance is "An Ordinance authorizing the erection in Forest Park of a building to be devoted to the purpose of art education." Sections 1, 2 and 3 of said ordinance are as follows:

"Section 1. The Board of Control of the St. Louis School and Museum of Fine Arts, *a department of Washington University,* are hereby authorized to erect in Forest Park in this city a building which, together with the site upon which it is located, shall be devoted to the use of this institution forever, for the exhibition of pictures and sculpture and such other means as are usually in such institutions for the education of the public in art.

"Section 2. The location of said building shall be determined by the Board of Control hereinafter provided.

"Section 3. Said building shall be erected subject to the following provisions: The building when completed shall be the property of the city for the uses hereinafter provided and no other. *The building and its affairs* shall be under the direction and jurisdiction of the Board of Control of the St. Louis School and Museum of Fine Arts, augmented by the Mayor, Comptroller and Park Commissioner of the city of St. Louis, who shall be ex-officio members of such Board of Control of *said building.*

"There shall be an exhibition of pictures and sculpture in said building which shall be free of charge to the public every Sunday afternoon from one o'clock until sundown, except at such times as repairs of the building and the rearrangement of collections are in progress, provided notice of such fact shall be given by public advertisement on two different days, and such exhibition shall be opened free to the public as much oftener as in the opinion of the Board of Control the financial condition of the institution will permit."

Respondent alleges that said ordinance is illegal and void because the city of St. Louis had and has no power or authority to authorize the use of Forest Park or any part thereof by Washington University in its department and school, known as the Board of Control of the St. Louis School and Museum of Fine Arts, for the purposes of said school, nor to place a building owned by the city and located in Forest Park under the direction and jurisdiction of the Board of Control, nor to devote its building to the use of any of the parties for any of the purposes in said ordinance mentioned, even though an exhibition of pictures and sculpture therein shall be free of charge to the

216 Sup—5

public every Sunday afternoon, and because neither Washington University nor the Board of Control of the St. Louis School and Museum of Fine Arts is a municipal institution or board; and the city of St. Louis having no right, title, or interest in either, is without power to require any of its officers as municipal officials to participate as members of the Board of Control, or any board having control of one of the schools or departments of Washington University; and because the title to said ordinance, contrary to charter provisions, is not sufficient, in that it does not indicate that the ordinance undertakes to require such acts of its officials, or to enact any regulations respecting the control of Washington University or any of its departments.

Denies that said Board of Control was ever organized with the Mayor, Comptroller and Park Commissioner as members, or participating therein. Alleges that it has not sufficient information to form a belief as to whether relator ever selected a site in Forest Park for the building mentioned in said ordinance, but alleges that if it ever had it was without the knowledge of respondent, the city of St. Louis, which had no notice thereof. Admits that the Louisiana Purchase Exposition Company was authorized to use a part of Forest Park for the St. Louis World's Fair, and that the arrangement between said company and the respondent required said Exposition Company to remove from that portion of Forest Park all of the buildings placed thereon and to restore the same to its former condition and that said company under said authority erected what is known as the Art Building, constructed in substantial and fire-proof manner so as to safeguard the valuable works of art loaned and used at said World's Fair; that it has not sufficient information upon which to form a belief as to whether said building cost as much as $750,000 or not; admits that it is of great value, but denies that it is appropriate

for use by relator or by Washington University as a school and museum of fine arts as contemplated by said ordinance or otherwise. Admits that said building still remains in said park, but denies that said Exposition Company with the knowledge, consent or acquiescence of the city permitted relator to take possession thereof, or to continue to occupy the same, and denies that there ever was any agreement that when the affairs of the said Exposition Company were finally wound up it would convey and turn over to relator for the city the said building, all its right, title or interest therein, and denies that the city ever agreed with any one that upon such arrangement being made the same should be taken as a compliance by relator or by any one else with the provisions of Ordinance 19969, or that the same should be used by relator for the purpose set forth in said ordinance.

Alleges that said Exposition Company erected said building under Ordinance 20412, whereby said company was permitted to use a portion of Forest Park under an agreement that it would remove all buildings, and restore the said park to its original condition, and that to secure the performance of said agreement it would execute and deliver to the city two bonds, one immediately and the other when notified so to do by the Board of Public Improvements of said city, and that after the erection of said art building the said Exposition Company being in default in giving said security, executed and delivered to the city as part security a mortgage on said Art Building, which the city holds to this day, the said company never having complied with its obligations to restore said park.

Admits that prior to March 7, 1907, the city of St. Louis had a population of more than 400,000 inhabitants.

Denies that at any time was there constituted and in existence, operation or authority, any administrative board endowed by said ordinance, or any legal author-

ity, with power to occupy or administer public property devoted by law or otherwise to the use of an art museum located in any public park by virtue of municipal authority.

Admits that the park referred to in the writ is Forest Park; that the property referred to as being devoted to the uses of an art museum is said art building, but denies that said building is the one referred to in said ordinance No. 19969, and denies that relator constitutes the administrative board endowed thereby with power to administer said property, and said museum, or either.

Admits the passage of the Act of March 7, 1907, and all the allegations of the alternative writ respecting the calling of an election and the vote upon the proposition to raise by taxation the art museum fund; that said tax was levied as stated, and there is now in the city treasury on account thereof the sum of $88,214.54, but denies that relator has exclusive or any control of the expenditure of said fund.

Admits that the persons named in the alternative writ, exclusive of the city officials mentioned, constituted the Board of Control of the St. Louis School and Museum of Fine Arts, but denies that the same was an administrative board endowed by said ordinance with power to occupy and administer public property devoted by law to the uses of an art museum in a public park, or that it became the first administrative board to administer said trusts and charity, and to control the expenditure of the art museum fund, or that said board is a legally constituted entity; admits that said board accepted the provisions of said act, but denies that they conformed thereto, and qualified thereunder, or that they have ever managed, controlled or administered the trusts and duties imposed by said act; admits that they are now managing said art building and using all of the property theretofore used by the St. Louis School and Museum of Fine Arts,

but denies that the exposition galleries are kept open free to the public under proper and reasonable regulations during suitable hours for a reasonable number of days each week, including Sundays and public holidays, as required by said act, or otherwise; admits that a great number of people have visited said art museum; that all revenues and donations coming into the possession of said board are used solely for the benefit of said St. Louis School and Museum of Fine Arts, and that no part is used for profit, but denies that said museum is used solely or at all as a free, public educational charity.

Respondent alleges that the Act of March 7, 1907, is illegal and unconstitutional, violative of sections 46 and 47 of article 4 of the Constitution of Missouri, and section 6 of article 9 of said Constitution, under which neither the State nor the city can lawfully grant public money or thing of value in aid of or to any individual, association or corporation, or make any appropriation or donation to, or in aid of, any corporation or association, or any college or institution of learning, or other institution, whether created for or to be controlled by the State or others.

That said act is special, and violative of sections 53 and 54 of article 4, and section 7 of article 9 of the Constitution of Missouri; that the Municipal Assembly shall provide by general laws for the classification of cities and towns not to exceed four, and the power of each to be defined by general laws, so that all such municipal corporations of the same class shall possess the same powers and be subject to the same restrictions, the first class organized and classified by the Legislature being cities having more than 100,000 population, and that this act confers powers on only a part of the first-class cities.

That said act is special in that by section 3 the conditions upon which the operation of this act was to take effect are such as to exclude from its operation

every city in the State where such cities acquire a population of 400,000 inhabitants in which such conditions do not exist, said conditions having no relation to any proper basis of classification for legislation.

The said act is violative of section 1 of article 2 of the Constitution, providing that all political powers are vested in the people, in that section 4 of said act authorizes the board appointed, not by the people or by any officer elected or appointed under authority of the people, but by Washington University, to administer the expenditure of public funds and to pepetuate itself by authorizing said board to fill vacancies.

That said act is unconstitutional in that it delegates to said board of control legislative powers in the expenditure and management of public funds and property, and if otherwise valid, delegates to such local board legislative power in managing and controlling a public municipal institution.

Respondent further alleges that the St. Louis School and Museum of Fine Arts is and always has been as aforesaid a school in and a department of Washington University, conducted by Washington University through its proper officers and agents as part of its educational institution, and for the benefit of its students upon such terms of tuition and otherwise as are determined by Washington University; that the same is open for visiting by the public at such times and such times only as Washington University or its officers and agents, said Board of Control, may determine, and for such fees and charges as they may determine, though at all times free to students enrolled in the department of the school and museum, "and the same is always open to a part of the people called annual members, whose membership is determined by said board of control, and for which a charge of ten dollars a year is made; that the said museum is also open free of charge to guests of the museum, determined by said management," and that said museum is

also used by said board for the purpose of giving private exhibitions and entertainments to which the public are not invited. That the St. Louis School and Museum of Fine Arts is not a municipal institution, is not managed or controlled by the city of St. Louis, nor by any of its officers, but is an institution entirely foreign to the said municipality. That it and its officers have refused to pay any money whatever upon the order or voucher of said Board of Control for the reason that it is advised and believes that it cannot lawfully pay the same.

The return then denies each and every allegation in the alternative writ, except those expressly admitted or alleged. Wherefore, having made full return, respondent prays that the alternative writ be quashed, and that the respondent be hence dismissed with its costs.

To this relator replies as follows: Relator denies every allegation of the return, except such as are hereinafter expressly admitted, and except such as are admissions of the allegations of the petition.

The reply denies that the members of the Board of Control are officers and agents of Washington University, and then repeats the allegation of the petition respecting its organization; denies that the relator is a department of Washington University or that it has not the legal capacity to sue, or that it has no legal right or title in the subject-matter of the action, except as officers and agents of Washington University, or that it has the right to use the collection and specimens of art only as such officers and agents, and repeats the allegation of the writ, that such use is fully invested in it as a separate legal entity.

Denies that since the passage of the Act of March 7, 1907, the School and Museum has been conducted and operated by Washington University as one of its departments and alleges that it has been and now is conducted as a free educational institution, as con-

templated thereby, admits the acts incorporating Washington University, and that many donations have been made for said school and museum, and alleges that the university as trustee holds and must continue to hold such donations to such trusts, and that said trustees have full power and authority to act as such trustee without violating the terms of the conveyances creating such trust.

The next few pages of the reply contain a long list of denials of the denials of the return, and then proceeds as follows:

"And relator alleges the fact to be that the said St. Louis School and Museum of Fine Arts is established, regulated and conducted in the same manner and upon the same general plan and scheme as are all of the art museums of the world, and particularly the art museums in the cities of New York, Buffalo, Chicago, Cincinnati, Cleveland, Detroit, Indianapolis, New Orleans, Philadelphia, Worcester, Trenton, and in the State of Utah, in nearly all of which cities and places the art museums are located upon public property, or in public parks, and that the location of such museums in public parks is essentially a park purpose, and a proper and legal use of such parks or public places, and further alleges that in, to-wit, all of the cities and States aforesaid, wherein art museums have been established and which are supported, maintained, or aided in whole or in part by a public tax, such museums are kept open for admittance by the general public only specified days, and on other days only specified members of the public, to-wit, students, are admitted, and that such arrangement is necessary to the proper protection and best interests of the community and is productive of the best results to the people, and that all such museums, whether supported in whole or in part by public taxation, have also life, contributing and annual members, who pay specified amounts for such memberships, and the amounts so

paid are used for the maintenance and support of the museums and *pro tanto* relieve the burden of supporting the same by taxation.

"Relator further alleges that the Museum in the city of St. Louis aforesaid controlled by relator is in no sense whatever a department of Washington University, nor is it in any manner conducted for the use or benefit of Washington University or the students thereof, but that such University and its students are allowed and enjoy no greater or other privileges than those allowed to and enjoyed by any other portion of the public; that those persons who pay an annual contribution of ten dollars, which contribution is used to help maintain said museum, do not enjoy any greater privileges than any other member of the community, but that said payment of ten dollars a year is simply a payment in bulk of forty admissions to the Museum on days when the museum is not open to the general public, which amounts only to the sum of twenty-five cents for each admission, and that any other member of the community is entitled to the same right of admission and to the same privileges as those who pay the annual sum aforesaid, by paying the twenty-five cents admission on said days when an admission price is charged, and that all sums realized from such admissions are added to and make a part of the sum used to maintain and enlarge said museum; that there is no discrimination or preference given or permitted by relator with respect to one class of citizens as against another, but that the regulations governing said museum apply equally to all citizens of the city of St. Louis.

"Further replying relator says that the Board of Control of the St. Louis School and Museum of Fine Arts is a legally created and constituted body, and the Art Museum aforesaid is free, public educational charity, and that it was within the power and authority of the people of the State of Missouri, speaking through

their legislators, to raise up such a new, free educational charity, to provide the agencies for the administration thereof, and to provide for the support and development thereof by requiring a portion of the taxes levied for municipal purposes to be applied to such maintenance and development.

"Wherefore relator prays the alternative writ of mandamus heretofore issued herein may be made peremptory and for costs herein."

I.   There is no essential dispute as to the facts developed on this application.   Mandamus is invoked to require the city to turn over to the Board of Control of the St. Louis School and Museum of Fine Arts, taxes to the amount of $88,214.54, now in the treasury of the city of St. Louis and set apart in a fund known as "The Art Museum Fund."   The disposition of a tax fund of such magnitude at once challenges the closest investigation, in view of the refusal of the city and its fiscal agents to recognize the right of said Board of Control to demand, receive and disburse said fund.   On the one hand, the Board of Control asserts that it is a public municipal body or legal entity created by Ordinance 19969 of the city of St. Louis, and by the Act of the General Assembly of Missouri, of March 7, 1907 (Laws 1907, p. 94), and as such is entitled to said fund, by virtue of said legislative enactment.   Whereas, on the other hand, it is as earnestly insisted that said Board of Control of the St. Louis School and Museum of Fine Arts is only a private association, a department of and a mere appanage of Washington University, and has and can have no lawful right to the said $88,214.54 of taxes, exacted and collected from the taxpayers of St. Louis.

The premises from which relator would reach the conclusion that it is a public municipal body and a separate legal entity, independent of Washington University, are the following:   From 1874 to 1879 the St.

Louis School and Museum of Fine Arts was a private
school established and maintained by Professor Halsey
C. Ives, who was at that time a member of the faculty
of Washington University. It had its inception in the
free classes in drawing and decorative design, estab-
lished in Washington University in 1874. A course of
free class lectures on art was given during that year.
A number of generous people in St. Louis voluntarily
provided funds for extending the scope of the work.

In 1879, Washington University organized this
free art school into a department of that University,
in pursuance to an ordinance of the University. It
bears the date May 22nd, 1879, and is entitled, ''Ordi-
nance establishing a department of Art in Washington
University.'' And the first article reads as follows:
''A Department of Art is hereby established as a spe-
cial department of Washington University, to be known
as the 'St. Louis School of Fine Arts.' '' The ordi-
nance provided for a director of said department, to
be appointed by the university board of directors, sub-
ject to the immediate control of the ''Board of Con-
trol'' provided for in article 9, as follows: ''The said
St. Louis School of Fine Arts shall be under the direct
management, as to its method of instruction and the
conduct of its affairs, of a special board of control, to
consist of ten members, who shall be appointed, in the
first instance, except as herein otherwise provided, by
the University Board of Directors as follows: The
chancellor of the university ex-officio; three, who shall
be elected by the University Board of Directors from
their own number and whose vacancies shall be filled
in the same manner, to hold office for a term of three
years; and six, who shall be citizens of St. Louis and
not members of the Board of Directors, whose term
of office shall be for four years, except, in the first in-
stance, three of them shall be appointed for two years
and the remaining three for four years. When so or-
ganized said 'Board of Control' shall be permanent and

vacancies occurring on the same, by death, resignation or otherwise, shall be filled, except as above provided, by nomination and election by the surviving members of the board.'' Articles 10: ''The Board of Control shall elect its own president and other officers, making its own by-laws and regulations, and have special charge of said art department under such rules as it may make, *subject however at all times* to the ordinances and rules of the University Board of Directors. It shall keep a record of its proceedings and the same shall be subject to the examination of any member of said University Board at any time. The Board of Control shall have no power to make any contract for nor to create any debt on behalf of the University, but from time to time the University shall credit said Board with such sum of money as may accrue from special revenues of the Department of Art, or which may be given for the purpose of immediate expenditure for the benefit of the same; and the sum so credited shall be expended by and under the direction of said Board of Control for the objects of the Art Department and in accordance with the provisions of this ordinance; provided further, that *an exact account of all receipts and expenditures shall be submitted by it to the University Board of Directors at least once in every six months and oftener if required.*''

The minutes of the Board of Trustees of Washington University show that on June 6th, 1879, the president laid before the board a letter from Wayman Crow, Esq., to the Rev. W. C. Eliot, President of Washington University, in which Mr. Crow refers to his deed to Washington University of a lot of land 150 feet front on Lucas Place, corner Nineteenth street, by 155 feet in depth to St. Charles street, and says: ''I convey this in trust for the use of the Department of Art designated as the St. Louis School of Fine Arts.'' He then named certain conditions, among others, that ''the University shall be under obligation to raise an endow-

State ex rel. v. St. Louis.

ment fund of not less than twenty-five thousand dollars, to be permanently invested, the interest of which shall be annually expended or appropriated in the purchase of works of art to be placed in the museum and that said endowment shall never be reduced below the said sum of twenty-five thousand dollars, nor the principal thereof encroached on.'' Thereafter Mr. Crow erected a museum building on said property at a cost of $143,000, and the School and Museum of Fine Arts was established therein with proper dedicatory exercises in the year 1881.

In view of the foregoing history of the St. Louis School of Fine Arts, the learned counsel for relator asserts that the ordinance of Washington University of May 22, 1879, did not have the effect in law of creating a separate corporate existence of the Board of Control of the said School of Fine Arts, and in this opinion the city counsellor and his associates clearly concur, for they insist that said board was originally created by the said ordinance of Washington University as a subordinate agency of Washington University to manage the department of art in that university and effectuate the trust of Mr. Crow and other liberal benefactors of said school of arts.

We agree with counsel for relator that the ordinance did not create a separate corporation of the Board of Control, for the reason that Washington University had no power to create another corporation, and because in our opinion no such purpose can be found in the ordinance itself, but that the whole purpose was to establish an agency to manage and control the department of art in that University and to avail itself of the endowment created by the generosity of Mr. Crow and other charitable benefactors of that institution.

Proceeding then to the next step in the history of the St. Louis School of Fine Arts, what effect did the ordinance of the city of St. Louis No. 19969 (conceding

for the present its validity) have upon the character of the Board of Control of the St. Louis School and Museum of Fine Arts? Was it the purpose of the city by that ordinance to change a confessedly private institution, an agency of Washington University, into a public municipal institution of the city of St. Louis and render it independent of Washington University? By the relator it is boldly asserted such was the result of the said city ordinance and it is as firmly denied by the city. The ordinance itself, whatever its legal effect under our Constitution and laws, must be looked to to ascertain the intention of the legislative branch of the city government. The title to the ordinance is, ''An ordinance authorizing the erection in Forest Park of a building to be devoted to the purpose of art education.'' The one subject expressed in this title is the grant of the right of erecting in Forest Park of a building to be devoted to the purposes of art education. There is not the slightest intimation or hint in this title that the Municipal Assembly had in view the purpose of creating a new municipal department or institution. But the first section of the ordinance leaves no doubt whatever of the intention of the city council. It provides: ''The Board of Control of the St. Louis School and Museum of Fine Arts, *a department of Washington University*, are hereby authorized to erect within Forest Park in this city a building which, together with the site upon which it is located, shall be devoted to the use of this institution forever for the exhibition of pictures and sculpture and such other means as are usual in such institutions for the education of the public in art.'' It is further provided that said building when erected shall be the property of the city for the uses therein specified, to-wit, it shall be under the direction of the Board of Control of the St. Louis School and Museum of Fine Arts, augmented by the Mayor, Comptroller and Park Commissioner of the city of St. Louis, who shall be ex-officio members of

said board.   Free exhibitions of pictures is provided for on Sundays from one o'clock to sundown, and such other days as the Board may permit.

*Ex vi termini* this ordinance recognizes an already established body and that body, *a department of Washington University.*

It is entirely wanting in any appropriate language, of a purpose to create a *new,* and hitherto a non-existent, *municipal institution,* and entirely destitute of any provision for the regulation and control thereof by the municipal authorities of St. Louis as an institution of the city.

It appears to us that learned counsel for relator concede,  as we think they must, that neither  the ordinance of Washington University of May 22, 1879, nor the ordinance of the city of St. Louis No. 19969, created, or by reasonable intent purported an intention to create, a distinct corporate body or legal entity of the Board of Control of the St. Louis School of Arts and Museum, but that the University Board was simply providing for the department of art in that institution by its act, and the city, by its ordinance, simply recognizing that department, was disposed to permit the university to erect a building in Forest Park to be used as a museum, without the slightest effort to endow said Board with any legal or corporate powers not already possessed by it.   In view of this recognition and grant, relator seeks to deduce a *new* corporate or public *municipal* institution by way of an estoppel, from the ordinance permitting the erection of the building in Forest Park, and when erected to be the property of the city, and the subsequent submission of the tax to the voters of St. Louis, and the acquiescence of the voters in the levy of such tax and its collection and payment into the city treasury and the Act of the Legislature of March 7, 1907.   But, as already noted, the Board of Control has never erected the proposed building, the city has never acquired title to such a building,

and the ground work of the estoppel is absent, but as we have said, even though the Board had erected the building, and the city had acquired it, still this would not have had the effect in law of making this department of Washington University a public municipal department or agency.

If it be said that the ordinance provides that the building contemplated should when erected be the property of the city, and that the Board of Control should be augmented by the Mayor, Comptroller and Park Commissioner, and that these facts indicated that the institution was to become a public body, still these facts fall far short of changing the character of the Board of Control from a private administrative body into a public municipal body. In St. Mary's Industrial School for Boys v. Brown, 45 Md. 310, a case very similar in many of its aspects to the one now under consideration, it was held that the fact that the governor of the State and the mayor of the city of Baltimore, each appoints, every two years, three persons to represent the State and the city in the Board of Trustees of the St. Mary's Industrial School for Boys, under the amendment of its charter, in no manner changed the nature of the institution nor made it a municipal agency, nor did it put the State or the city in such relation to the corporation as to make it either a public, State or municipal institution. In the same case it was held that the mere fact that the city of Baltimore owned the ground upon which the building was erected and that the city in its deed to the institution had reserved certain privileges in the use of the Hall of the Maryland Institution for the promotion of mechanic arts, a part of the consideration for the grant, could not constitute that corporation a municipal agency. In the course of its opinion the court said: "The fact that the Governor of the State is empowered to appoint ten, and the mayor of the city five, of the directors of the institution, the board being composed of thirty, does not put the State

nor the city in such relation to the corporation as to make it either a public, State or municipal institution. The object, manifestly, in providing such representation in those institutions, on the part of the State and city, was for the purpose of removing an objection to them, made by some portions of the community, that they were close corporations; that there were no means provided to give assurance to the public that the inmates of the institutions were properly treated; and inasmuch as those institutions themselves applied for and obtained from the Legislature compulsory powers and control over the inmates, it was deemed proper that the State and the city should appoint the number of trustees and directors named. Such trustees and directors, however, do not control the institutions; nor are they clothed with any State or municipal authority, beyond their mere appointment, to be exercised in the management of the affairs of the institutions, and cannot, therefore, be directed, controlled, limited or restrained, in the exercise of the powers and duties as prescribed in the charters and by-laws of the corporations in whose proceedings they participate. They simply exercise, in common with the other trustees or directors, the special authority conferred by the acts of incorporation, and nothing more. [Nelson v. Cushing, 2 Cush. 529.] So far, therefore, as the city is concerned, these corporations are entirely separate from and independent of it, in all corporate action and control.''

And so we may say of ordinance 19969. The fact that it required the building in Forest Park, which was to be erected by the Board of Control of the St. Louis School and Museum of Fine Arts, should be under the direction of the Board of Control augmented by the Mayor, Comptroller and Park Commissioner, did not have the effect of changing the charter and by-laws of Washington University and the by-laws adopted by

216 Sup—6

the Board of Control under the powers granted to it as an agency of Washington University. The Mayor, Comptroller and Park Commissioner were not thereby clothed with any municipal authority, beyond their mere appointment, to be exercised in the management of the affairs of the institution. If they took their places in the said Board of Control, they were simply exercising in common with the other directors the power conferred upon the Board of Control by Washington University, and nothing more.

But there is another more cogent reason why the said Ordinance 19969 did not, and could not have the effect claimed, because by its terms it relates solely to *the building authorized to be erected by the Board of Control* of the St. Louis School and Museum of Fine Arts, a department of Washington University, and that Board of Control has never erected in Forest Park a building to be used as a museum for the exhibition of pictures and sculpture, and the city of St. Louis has not acquired the title to the building erected by the Louisiana Purchase Exposition Company, and neither had the said Board acquired the title thereto, but is occupying the same, only under a five years' lease from the Louisiana Purchase Exposition Company, to which the city of St. Louis was and is not a party.

II. This brings us to the other contention, that under the Act of March 7, 1907, the said Board of Control of the St. Louis School and Museum of Fine Arts is not a department of Washington University, but is a separate legal entity, constituted by the said act of the General Assembly, and the action of the people in voting the tax provided by that enactment.

An analysis of this act will aid us in determining its effect and the constitutional objections to it, which are urged by the city. Obviously it was carefully drawn to evade, if possible, the prohibitions of the Constitution of this State relative to the enactment of

local and special laws—article 4, sections 53 and 54. Section 1 provides that upon the petition of one hundred taxpayers of any city in this State, which now has or may hereafter have four hundred thousand inhabitants or more, asking that an annual tax of one-fifth of a mill on the dollar annually on all taxable property in such city, shall be levied for the establishment, maintenance or extension of a museum of art for the benefit of the public in such city, and praying that the question whether such a tax shall be levied be submitted to the voters of the city at a special or regular election, and if a majority of all of the votes cast in such city upon such proposition for and against said tax, shall be for the tax, the said tax should be levied and collected in like manner with other general taxes of the city. The second clause then defines what shall constitute an art museum, to-wit, that it shall be an institution for the collection and exhibition of pictures, statuary and other works of art for exhibition in an art gallery or museum for instruction in art; which said museum shall be provided with exhibition galleries, which shall be opened free to the public under proper and reasonable rules during suitable hours for a reasonable number of days in each week, including public holidays, and if admission fees or charges should be collected at any time, the amount so collected shall be held for the maintenance of said art gallery. Section three provides that when, in any such city, it shall have been decided that the tax shall be levied for an art museum, the mayor of such city shall with the approval of the legislative branch of the municipal government proceed to appoint an administrative board of nine members to control the expenditure of the art museum fund, "unless and except there shall be at the time already constituted and in existence, operation and authority, an administrative board endowed by city ordinance or other legal authority with power to occupy or administer public property devoted

by law to the uses of an art museum located in a public park or upon public property by virtue of municipal authority; and if there be such a board, such board and its successors shall be the board of control for the art museum fund under this act for all the purposes and possessing all the powers and charged with all the duties provided for such board in this act." Section 4 provides that the administrative board of control when appointed by the mayor, as provided by the preceding section, shall assemble and elect one of its members president, and such other officers as may be necessary, and its members shall divide themselves into three classes, one-third to hold office for one year, one-third for two years and one-third for three years, and annually thereafter said board shall elect members for the class whose terms have expired and fill vacancies in other classes, and the said board, with the consent of the mayor and legislative branch of the city, shall have power to add to its members and adopt a by-law regulating the manner in which it members shall be chosen. The members of said board shall hold office for three years and until their successors are chosen and no member shall receive compensation as such. The power is also given the mayor, with the consent of the legislative branch, to remove any member for misconduct or neglect of duty. By section 5 it is provided that this board of control shall make and adopt by-laws for its own guidance and for the election of its members and the administration of the art museum fund, and shall have exclusive control of the expenditure of all moneys collected to the credit of the art museum fund, and of the construction and maintenance of any art museum building built or maintained, in whole or in part, with the moneys of said fund, and of the supervision, care and custody of the grounds, rooms or buildings constructed, leased or set apart for the purposes of said museum, provided, however, that all moneys received for such art museum fund shall

be deposited in the treasury of said city to the credit of the said fund, and be kept separate and apart from other moneys of the city, and shall be drawn upon by the proper officers of such city upon the properly authenticated vouchers of the art museum board. Said board shall have the power to purchase or lease ground and occupy it, lease or erect an appropriate building for the use of said art museum, and have power to appoint a director and necessary assistants and fix their compensation, and remove such appointees and in general carry out the intent of this act.

While this act provides on its face intention to apply presently and prospectively to all cities of the State that now have or may hereafter have 400,000 inhabitants or more, it is perfectly apparent that the only city to whom it could apply for many years to come was the city of St. Louis. But more than this the words of the 3d section beginning with the proviso "unless and except" clearly indicate the city to which that proviso was intended to apply and that was the city of St. Louis. It will be seen by this proviso, the Legislature has undertaken to appoint by specific description the administrators of public funds and moneys raised by local taxation, regardless of the right of the people of such city to elect or the municipal authorities thereof to appoint and hold such officials responsible to the local authorities. In the city or cities that fall outside of this proviso the administrative board of one of these museums of art is to be appointed by the mayor and confirmed by the legislative body, but in the only city coming within the proviso clause, which as we have seen was at that time St. Louis, the board designated in this clause and given the power of perpetual self-succession, was a board of control over a then existing art museum, which was not even required to be a free or public museum, and that existing board was to constitute a board of control for the tax fund raised under this act. The fund thus to be raised by

taxation was and is to be applied to the art museum already in existence under the control of said existing board, and by section 6 of the act, this existing art museum, thus maintained and to be maintained in part from the taxes so provided, is to be free just so long as the art museum tax shall be contributed to such board of control. Whenever the art museum tax ceases, as is provided in section one, then the said existing museum should cease to become free and public, without any provision for the return to the city of any of the property, statuary or works of art which shall have been purchased with the public funds arising from such taxes. Section 9 provides that the said existing board of control is given the power to have vested in it, as special trustees, the title to any and all property donated, devised or bequeathed to said existing art museum. In contradistinction to the board of control of said existing art museum, in cities outside of the proviso clause, the public museum from its inception would necessarily be a public institution and the property of the city and the board of control in such cities a public body, and the property acquired by them by gift or as the result of taxation would belong to the city. It will thus be seen that of the two classes of art museums provided for by this Act of 1907, in those cities falling within the peculiar proviso clause, the existing museum and its existing board of control are given the power to say to the inhabitants and voters of such city, ''Whenever you withdraw this museum tax, our museum ceases to be free and public,'' whereas in all other cities outside of this proviso clause, the inhabitants and voters are left entirely free to continue or discontinue the tax from time to time, with the certainty that whatever they have already acquired by and through that tax shall forever remain their own and forever public and free. In the city falling within the proviso the administrative board designated by section 3 and given the power of self-

perpetuation is not required to be a public body or com-
posed of public 'officers at all; they are simply to be
an administrative board, which private corporations
and associations of many kinds have for the adminis-
tration of their own affairs.   And yet, this tax which
is sought by this proceeding is as much within the power
and control of this private administration board as it
is in the other cities under the control of the public
board, or a board of public officers.   We are unable to
discern any where in this third section of the act, any
legislative declaration or requirement that the admin-
istrative board falling within the proviso, shall be a
public official body of that city.   With this summary
of the act before us, the question recurs, did this act
in and of itself constitute the Board of Control of the
St. Louis School and Museum of Fine Arts a distinct
legal entity or corporate body and a public municipal
institution of the city of St. Louis as claimed by the
relator in its petition and argument in this court?
In our opinion it clearly did not.   Throughout the whole
of the act there is a marked distinction between that
class of public museums of art provided for in cities
of 400,000 or more, which do not fall within the "un-
less and except" clause of section 3, and the art museum
which was existing at the time of the passage of the
act and under the control of an administrative board
already in existence.   The first class, we think, were
intended to be public departments of the cities in which
they were established and were to be officered by boards
elected or appointed by the municipal authorities and
subject to the control of the city authorities, and when-
ever the voters of such a city saw fit to deny the tax
to support the same, then such tax should cease, but
the property would remain the property of the city,
whereas under the proviso in section 3 and the other
sections referring to the museums existing under the
peculiar conditions recited in said proviso, the only
fact upon which can be predicated the conclusion that

such existing museums were to become public municipal institutions is the fact that it was to become the beneficiary of the taxes exacted from the taxpayers for its support, and that the public *pro tanto* were to have the benefit of such museum so long as such tax was levied and collected. In other words, the argument is based upon the proposition that, because there was to this modified extent a public end in view and a public benefit provided, therefore the corporation or institution which was given the control of this fund derived from taxation *ipso facto* became a municipal corporation without any legislative declaration that such should be the effect of the act. In our opinion the same reasoning by which we arrive at the conclusion that the ordinance 19969 of the city of St. Louis did not change the nature and character of the St. Louis School and Museum of Fine Arts and erect it into a municipal institution of the city applies with equal force to this Act of March 7, 1907. It may be granted that the public has an interest in the dissemination of learning and useful knowledge and the beneficial results which would flow from the establishment of a school and museum of fine arts such as the founders of the St. Louis School of Fine Arts had in view when they established it. But as was said in the case of Regents of The University of Maryland v. Williams, 9 Gill & Johnson, l. c. 399: "While the uses or objects may in a certain sense be called public, yet the corporations as distinguished from the uses or objects, are private." And to our minds there is an intentional purpose exhibited in this act to refrain from denominating the Board of Control of the St. Louis School and Museum of Fine Arts a public official body of the city of St. Louis or in other cities which may fall within the peculiar conditions prescribed in that act. But on the contrary, we think it is evident that the private nature of this administrative board or Board of Control of the St. Louis School and Museum of Fine Arts should

remain as it has been from its inception, a mere agency of Washington University for the administration of the benefactions of Mr. Crow and other liberal citizens of St. Louis, and that this act did not change or intend to change the character of this Board of Control from what it had always been prior to the passage of the Act of 1907. The corporate authorities of the city of St. Louis have no power under this act to regulate and control this museum of art under the scheme provided in section 3 thereof, but the whole control is vested in this private board to demand and receive taxes from the taxpayers of St. Louis and expend it without liability to the city authorities for their proper disposition. We think the reasoning in St. Mary's Industrial School for Boys v. Brown, 45 Md. 310, is peculiarly applicable to the facts of this case, and the mere fact that the ordinance of the city provided that the board should be augmented by the addition of the Mayor, Comptroller and Park Commissioner did not change the nature and character of the Board of Control of the School of Fine Arts. So that without further elaboration, we are constrained to hold that the contention of the learned counsel for the relator that the Act of 1907 changed the Board of Control and created it a separate legal entity distinct from the Washington University, which had created it in the first instance, and which under its organization retained the control over it, is not tenable.

III. Having reached the conclusion that the Board of Control of the St. Louis School of Fine Arts is an agency and administrative board of Washington University for the management of the endowment made by Mr. Wayman Crow and others, and that said board is not a corporate body or legal entity in and of itself, and does not constitute one of the municipal institutions of the city of St. Louis, has it established the right to demand of the city the $88,214.54 levied and

collected as taxes from the taxpayers of St. Louis and to disburse and expend the same on its own vouchers and to demand a continuance of such levy?

Trite as it may seem, it is well to reiterate the mandate found in section 3 of article 10 of the Constitution of Missouri that "taxes may be levied and collected for *public purposes only.*" This was the recognized law long before it was deemed necessary to incorporate it in our Constitution. Perhaps it has never been stated more forcibly than by Mr. Justice MILLER for the Supreme Court in Loan Association v. Topeka, 20 Wall. (U. S.) 655. He said: "In deciding whether, in the given case, the object for which the taxes are assessed falls upon the one side or the other side of this line, the courts must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether State or municipal."

The Supreme Court of Michigan in People ex rel. v. Salem, 20 Mich. 452, considered this question and reached the conclusion that the term "public purpose," as used in the Constitution in this connection, "has no relation to the urgency of the public need, or to the extent of the public benefit which is to follow. It is, on the other hand, merely a term of classification, to distinguish the objects for which, according to settled usage, the government is to provide, from those which, by the like usage, are left to private inclination, interest or liberality." These announcements met the approval of this court in State ex rel. v. Switzler, 143 Mo. l. c. 316, 317. Now from what we have already said, it is apparent that this "Art Museum" tax was to create a fund *by taxation,* which was to be turned over to a private board of control, for the department of Washington University, a pri-

vate corporation, created by the laws of this State, and
this fund was to be expended, not by municipal officers
of St. Louis, but upon vouchers sent to the City Auditor
by this Board of Control of this private institution.
Such a scheme, we hold is antagonistic to the funda-
mental principles of our organic law and our municipal
institutions. No one can read the various constitu-
tional provisions, found in section 1 of article 10 and
section 10 of the same article, which provide that "the
taxing power may be exercised by the General As-
sembly for State purposes, and by counties and other
municipal corporations, under authority granted to
them by the General Assembly, for county and other
corporate purposes," and "the General Assembly
shall not impose taxes upon counties, cities, towns, or
other municipal corporations or upon the inhabitants
or property thereof, for county, city, town or other
municipal purposes, but may, by general laws, vest
in the corporate authorities thereof the power to assess
and collect taxes for such purposes," without being
impressed with the jealousy of the framers of the
Constitution of 1875, of the power to levy and collect
taxes. These provisions indicate that it was their
purpose that taxes should only be levied for *public
purposes* and when collected should be administered
and disbursed only by public officers elected or ap-
pointed according to law and that their accounts should
from time to time be investigated by the lawful au-
thorities, and that municipal corporations were only
authorized to levy and collect taxes for municipal pur-
poses, and municipal enterprises should be conducted
and controlled in fact by such municipalities by and
through their proper officers, and were not authorized
to exact taxes and turn them over to any private indi-
vidual or board of any private corporation to dis-
burse at their discretion. But they did not stop with
this. The Convention which framed the Constitution
of 1875 was fully cognizant of the recklessness with

which the counties and cities of this State had voted
aid and granted assistance to corporations with a view
to construct railroads and aid other corporate enter-
prises, and it inserted section 46 of article 4, which
provides: "The General Assembly shall have no
power to make any grant, or to *authorize the making
of any grant of public money* or thing of value to
any individual, association of individuals, municipal
or other corporation whatsoever: Provided, that this
shall not be so construed so as to prevent the grant of
aid in a case of public calamity." And section 47 of
article 4, which further provides: "The General As-
sembly shall have no power to authorize any county,
city, town or township, or other political corporation or
subdivision of the State now existing, or that may be
hereafter established, to lend its credit, or to grant
public money or thing of value in aid of or to any indi-
vidual, association or corporation whatsoever, or to
become a stockholder in such corporation, association
or company," provided the Legislature should not be
prohibited from providing by law for pensioning crip-
pled and disabled firemen and relieving their widows
and minor children.

The Constitution of 1865, section 14 of article XI
thereof, provided that "the General Assembly shall not
authorize any county, city or town to become a stock-
holder in, or loan its credit to, any company, associa-
tion or corporation, unless two-thirds of the qualified
voters of such county, city or town, at a regular or
special election to be held therein, shall assent thereto."
By an act of the Legislature of February 24, 1870,
entitled, "An Act to locate and dispose of the Con-
gressional land grant of July 2, 1862, to endow, sup-
port and maintain schools of agriculture and the me-
chanic arts and a school of mines and metallurgy and
to promote the liberal and practical education of the
industrial classes in the several pursuits and profes-
sions of life," it was provided said school of mines

should be a branch or a part of the University of Missouri and should be located in a county in the mineral district of Southeast Missouri, having mines therein, which should donate to the Board of Curators of the University the greatest amount of money and funds. The county court of such county was authorized to issue bonds in such sum as they might agree upon, to run not longer than twenty years and to bear interest not exceeding ten per cent, which bonds should be delivered to the curators of the University to be, by them, sold, the proceeds to be used to erect the school building. Without an election the county court of Phelps county offered to and did donate bonds of said county to the amount of $75,000 and turned them over to the curators. Thereupon the State of Missouri brought suit to enjoin the sale of said bonds on the ground that such subscription was void and in contravention of section 14 of article 11 of the Constitution of 1865. A demurrer was filed and the circuit court sustained it and the State appealed. Judge Napton, speaking for this court, said: "It is not pretended that the provision of the Constitution was complied with, but it is urged that the subscription or loan of credit of Phelps county to the University was to a *public* corporation, and therefore not within the meaning of the constitutional restriction. That the curators of the University constitute a corporation is not denied, but it is said that this provision of the Constitution was directed solely against subscriptions to private corporations. The language of the section makes no discrimination of this sort, nor does the main purpose of the prohibition require any such discrimination. What was the object of restriction on county courts, city and town municipalities? The object was plainly to prevent them from taxing the people without their consent. No loan or credit was allowed to any company, association or corporation without the consent of the people who had to pay it. The business of the

company, association or corporation is not referred to in the Constitution. . . . What right, then, has this court to interpolate the word 'private' into this section of the Constitution? The corporation to which the bonds in question were issued was in some respects a public corporation, and established for educational purposes—an object always held in high regard by the State; but why is this object, however laudable, to overturn a plain provision of the Constitution, or to authorize a taxation which the Constitution forbids?" Accordingly it was held the bonds were void and their issue perpetually enjoined. [State of Mo. v. Curators of State University, 57 Mo. 178.]

Now the convention which framed the Constitution of 1875 must be presumed to have known of this construction of the Constitution of 1865, by this court, as the eminent counsel who obtained that opinion from this court was a member of the constitutional convention of 1875, and it was likewise composed largely of the most eminent counsel in the State at that time. And yet, it re-enacted in substance all of said section 14 of article 11, save and except the provision which authorized a city or county to become a stockholder in any company, association or corporation with the assent of two-thirds of the qualified voters of such county, city or town, so that under the Constitution of 1875 the prohibition against the power of the Legislature to authorize any county, city, town or township to grant public money or thing of any value in aid of or to any individual, association or corporation whatsoever is absolute (Sec. 46, art. 4, Constitution of 1875), and the Legislature has no power to authorize any city to lend its credit or grant public money or thing of value in aid of or to any individual, association or corporation whatsoever regardless of the question whether it is a public or private corporation or association. And by section 6 of article 9 no such municipality can make any appropriation or donation, nor

loan its credit to or in aid of any college or institution of learning or other institution whatsoever, whether created for or to be controlled by the State or any person whatsoever, except the municipal corporation itself.

In view of these constitutional provisions the argument of the counsel for the relator that this tax can be upheld and this art museum fund turned over to the board of control of the St. Louis School of Fine Arts, because said tax is for a public purpose, is in our opinion wholly untenable. The said board was originally created by the ordinance of the directors of the Washington University as a subordinate agency to manage the art department of that school and execute the trust created by the endowment of Mr. Crow and others. And the language of section 3 of the Act of 1907 clearly was intended to designate the said Board of Control, for whose benefit the tax provided in section 1 of said act was to be created, and to whom it was to be turned over to be expended without interference by the municipal authorities, although the said municipal authorities were required to levy and collect the same. In our opinion this was an attempt to require the city of St. Louis and its taxpayers to donate this art museum tax to the support of a department of Washington University, a private corporation, and, in our opinion, to that extent the act was clearly within the prohibitions of the Constitution already noted, and therefore void.

IV. It is insisted by learned counsel for relator that the Act of March 7, 1907, created the relator, the Board of Control of the St. Louis School and Museum of Fine Arts, into a separate legal entity and constituted it a public municipal institution of the city of St. Louis, entirely divorced from the authority of Washington University, which had, in the first instance, created said board, and that the act in ques-

tion not only created the office but designated the members of the said board as the first officers of said municipal institution, and that as the office was one not provided for in the Constitution of Missouri it was the province and duty of the Legislature to provide for the filling of the office under section 14 of article 9 of the Constitution, which provides, "Except as otherwise directed by this Constitution, the General Assembly shall provide for the election or appointment of such other county, township and *municipal* officers as public convenience may require; and their terms of office and duties shall be prescribed by law; but no term of office shall exceed four years." Counsel have cited us to a number of cases in other States, which announce the general doctrine that it is within the province of the Legislature to create offices and provide for filling the same except in those cases in which the Constitution has provided for the office and the filling of the same. There can be no question about the soundness of this general statement, but it is one thing to define an office and the duties appertaining thereto and providing for the filling of the same, and quite another thing under our Constitution for the Legislature to undertake itself to appoint officers. Appointments to office are in their nature intrinsically executive acts. As was said by this court: "That section [referring to section 9 of article 14] expressly authorizes the General Assembly, acting within its legislative capacity, to pass a law prescribing the manner in which an appointment shall be made, but it does not authorize the General Assembly to make the appointment itself, nor authorize any one unconnected with the government to do so. To provide by law the manner in which an appointment shall be made is one thing, to make the appointment is another; the one is in its nature legislative, the other is essentially executive. The Constitution authorizes the Legislature to do the one, but not the other. . . . If the General As-

sembly had essayed to appoint the third election com-
missioner itself, the act of appointment would clearly
have been void, because it would have been an attempt
to exercise executive power.   Since the Legislature
cannot appropriate to itself a power that the Constitu-
tion has conferred on the executive, can it rob the
executive of that power by conferring it on an out-
side unofficial agency of its own appointment?'' [State
ex inf. v. Washburn, 167 Mo. 1. c. 693.]

This statement of the law is borne out by Mechem
in his work on Public Offices and Officers, sections 104
to 107 inclusive.

So that if it can be claimed that section 3 of the
Act of 1907 constituted the Board of Control of the
St. Louis School and Museum of Fine Arts a separate
municipal legal body, then the Legislature had no
power to name the individuals then constituting the
board as its first officers, as the Legislature had no
authority to create the office and name the private
individuals who had previously acted under the au-
thority of Washington University as the officers of said
Board.   But, as already said, we do not think that
the Act of 1907 changed said Board of Control into
a public municipal body, but with great care refrained
from so doing in order that it might receive the benefit
of taxation so long as the people were disposed to tax
themselves for its benefit, but the moment they should
refuse to do so, it would retain and resume all of its
rights as a department of Washington University, a
private corporation.

Having reached the conclusion that the relator in
this case is but an agency and department of Washing-
ton University through which the University is admin-
istering the trust created by Mr. Crow and other bene-
factors, and that Washington University is powerless
to abdicate its management of the said trust without
a violation of its terms, it follows, we think, neces-

216 Sup—7

sarily that the relator has no legal capacity as such to sue as relator or otherwise, because it is not a legal entity or corporate body. [Bulkley v. Big Muddy Iron Co., 77 Mo. 105; Lilly v. Tobbein, 103 Mo. 477; Dicey on Parties, p. 147.]

Learned counsel for relator has filed a most elaborate brief to demonstrate that the art museum is a public use and the right and power of the city to act as trustee to such trust, and without controverting any of the propositions involved in that discussion, the conclusion at which we have arrived, that the relator is but a subsidiary agency of Washington University in the management of the trust which was clearly created by Mr. Crow, by which Washington University was made the trustee, and that the pictures and sculpture belong to that trust, and that the city has acquired no title therein and has not been made the trustee in lieu of Washington University, and that the art building is not the property of the city, and the title thereto has never yet vested in the city, and that the tax for which relator sues in this case, notwithstanding the circumlocution employed in the Act of 1907, is after all but a donation to Washington University for its department of art, the length of this opinion forbids us to review the great number of cases collected with so much industry and ability by the learned counsel for the relator.

We have no doubt whatever that Washington University and the Board of Control of said St. Louis School and Museum of Fine Arts have administered the trust confided in them by Mr. Crow with great success, and that it is a most deserving charity, one which must conduce to the great benefit of those for whom it was established. It may be that the city of St. Louis by its Municipal Assembly may provide a museum in its public parks which shall be under the control and direction of the municipal authorities of said city and that a portion of the revenue of the city

may be devoted to building it up.  But in our opinion
the tax fund derived under the Act of 1907, by virtue
of the proviso clause in section 3 of said act, is but
a donation to Washington University, a private cor-
poration, and to that extent it is in violation of the
Constitution of this State and the provisions thereof,
which have hereinbefore been set forth at length.  It
results that in our opinion the alternative writ should
be and is hereby directed to be quashed and a peremp-
tory writ of mandamus denied, and it is accordingly
so ordered.  *Valliant, C. J., Burgess, Fox* and *Wood-
son, JJ.,* concur; *Lamm* and *Graves, JJ.,* dissent.