## MICHIGAN SUGAR CO. v. AUDITOR GENERAL.

1. CONSTITUTIONAL LAW — BEET-SUGAR BOUNTY — TAXATION FOR PRIVATE PURPOSE.

   Act No. 48, Pub. Acts 1897, providing for the payment of certain bounties to manufacturers in the State of sugar from beets grown in the State, is unconstitutional, as authorizing taxation for a private purpose.

2. SAME.

   An unconstitutional statute is of no more saving effect to justify action under it than as though it had never been enacted; therefore, persons who engaged in the manufacture of beet sugar in this State in reliance on the provisions of Act No. 48, Pub. Acts 1897, appropriating a certain sum for the payment of bounties, and declaring the excess, if any, payable out of the general fund, which legislation was wholly unconstitutional, have no claim against the State by virtue of Act No. 263, Pub. Acts 1899, by which the legislature sought to provide a tax to meet appropriations not otherwise provided for, intending, it is claimed, to recognize such bounties as earned.

*Mandamus* by the Michigan Sugar Company to compel Roscoe D. Dix, auditor general, to issue a warrant for the

payment of a bounty.    Submitted June 12, 1900.    Writ
denied October 2, 1900.

*T. A. E. & J. C. Weadock* (*H. H. Hatch*, of counsel),
for relator.

*Horace M. Oren*, Attorney General (*C. D. Joslyn*, of
counsel), for respondent.

LONG, J.    In 1897, the legislature of this State passed
an act entitled:

"An act to provide for the encouragement of the manu-
facture of beet sugar, and to provide a compensation
therefor, and to make an appropriation therefor."    Act
No. 48, Pub. Acts 1897.

Section 1 provides:

"There shall be paid out of the State treasury to any
person, firm, or corporation engaged in the manufacture,
in the State of Michigan, of sugar from sugar beets
grown in the State of Michigan, one cent per pound upon
each and every pound of sugar so manufactured, under
the conditions and restrictions hereinafter provided."

Section 2 provides:

"No money shall be paid for sugar so manufactured
unless such sugar shall have been so manufactured in this
State, and from beets grown in the State of Michigan,
and unless such sugar shall contain at least ninety per
cent. crystallized sugar, and the manufacturer shall pro-
duce good and sufficient receipts and vouchers to show
that at least four dollars per ton of twenty hundred pounds
has actually been paid for all beets purchased containing
twelve per cent. of sugar, said twelve per cent. being the
basis for valuation of the purchase price of four dollars
per ton.    The quantity and quality of sugar upon which
all of said bounty is claimed shall be determined by the
commissioner of the State land office, with whom all claim-
ants shall from time to time file verified statements show-
ing the quantity and quality of sugar so manufactured by
them, the price paid the producer for the beets actually
produced in this State, upon which said bounty is claimed."

Section 3 provides:

"The persons, firms, or corporations so intending to

engage in the manufacture of beet sugar in this State shall, before commencing the same, file a statement with the commissioner of the State land office, setting forth their proposed undertaking, the capacity of their manufactory, the number of tons of beets they intend to manufacture per annum, and request said commissioner of the State land office to appoint a suitable weighman and inspector, as hereinafter provided."

Sections 4 and 5 provide that the commissioner of the State land office shall appoint a weighman and inspector to keep an accurate account of the sugar manufactured and the kind and character of the beets furnished; and also provide that the person, firm, or corporation buying the beets and manufacturing the sugar shall, in order to obtain the bounty provided by the act, pay to the seller of the beets at least four dollars per ton for beets containing 12 per cent. of sugar, and a sum proportionate to that amount for beets containing a greater or less per cent. of sugar.

Section 6 provides:

"When any claim arising under this act is filed, verified, and approved by the commissioner of the State land office, as hereinafter provided, he shall verify the same to the auditor general of the State, who shall draw a warrant upon the State treasurer for the amount thereof, payable to the person, firm, or corporation to whom said sum or sums are due."

The act appropriated the sum of $10,000 for the years 1897 and 1898, and provided that, if the bounty should exceed that amount, the deficit should be paid from the general fund.

In 1899 the legislature passed Act No. 263, entitled:

"An act to provide a tax to meet the several appropriations for which a tax is not otherwise provided, for the general expenses of the State government, salaries of the State officers, expenses of the State departments, and expenses of the legislature for the years eighteen hundred ninety-nine and nineteen hundred."

Section 2 of this act provides:

"The several sums appropriated by the provisions of

any act to meet which this act provides a tax shall, so far as moneys are required to be paid to the boards or officers of any institution or commission, be paid out of the general fund in the State treasury to the proper board or officer, at such times and in such amounts as the general account-ing laws of the State prescribe, and the disbursing officer of such board or commission shall render his accounts to the auditor general thereunder."

It is claimed that, while this last act does not, in terms, provide for an appropriation of any moneys to pay the bounty on beet sugar manufactured, yet it was the intent of the legislature to provide by the act for such bounty, as a committee of the house of representatives caused a statement to be made showing the different amounts necessary to be raised, and it is claimed that in this statement was an estimate of an excess of bounty over the tax previously raised, amounting to $42,714.06, and a further estimate of the amounts needed for the years 1899 and 1900 of $50,000 and $150,000, respectively. On the other hand, it is claimed by the respondent that under date of December 2 and 29, 1898, the relator presented its claim for bounty earned, amounting to $28,451.07, which presumably covered all claims to the end of the year 1898; and that no specific appropriation was made by the act of 1899, nor any taxes levied, for such bounty. Relator claims that there is due it for such bounties the sum of $24,262.99. The accounts were presented to the auditor general by the relator for such amount, and payment was refused.

It appears that the relator is a corporation organized under the laws of the State, with a capital stock of $200,-000, and that it has fully complied with all the provisions of the act of 1897 to be entitled to the bounty provided by that act. But two questions are raised: (1) It is claimed that there is no money in the State treasury with which to pay the bounty claimed, as the act of 1899 made no appropriation for it, and therefore the respondent properly refused to draw a warrant for the same; while, on the other hand, it is claimed by relator that an appropriation

was made, and that, though the act of 1897 be found unconstitutional and void, the relator is entitled to have the bounty paid, as the legislature has recognized by the act of 1899 the right of the relator to have the bounties earned under the act of 1897. (2) It is claimed by respondent that the act of 1897 is unconstitutional.

We will discuss the last proposition first. This taxation is for no such public purpose that it can be upheld. There is no power in the State to authorize a tax for private purposes. Taxes can be levied only for public purposes, to accomplish some government end. The legislature is the mere creature of an organic law, deriving all its power from the Constitution. Its power within those limits must be admitted to be plenary, except so far as otherwise specifically limited; but, outside those limits, it is as powerless as if specifically prohibited. It cannot take the property of A. and give it to B., nor can it tax it for the benefit of B. Here is a private corporation now calling upon the State for a sum of money to aid it in carrying on a private business, most of which money, if paid, must come out of the pockets of people who are not engaged in that business, and who have no interest in it. It is claimed by the relator that this is not a gift to the relator, but that it would not have engaged in the business but for this act of the legislature; that, in reliance upon the act, it built a plant at large expense, and that it complied with the provisions of the act requiring it to pay to the producers of beets at the rate of four dollars per ton; and that, therefore, the honor and integrity of the State are involved. So the honor and integrity of the State might become involved under any other act, however unconstitutional, which the legislature might see fit to pass. What may have brought about the passage of the act of 1897 we need not discuss; the only question being whether it is within the legislative power. We need not point out specifically any particular provision of the Constitution which it violates. It is void whether it comes within any of the express provisions of the Constitution or not. It is

not a law, but an act which attempts to take the property of one citizen, and turn it over to another; to compel one class to donate a part of its property to another. Under the express terms of the Constitution, private property cannot be taken for private use, even with compensation, without the owner's consent; nor can it be taken for public use without just compensation. There is no claim here, nor can any be made, that these taxes thus imposed under the act are for any public use; nor could the State itself carry on such a business.

Counsel for relator seek to uphold this legislation by several cases cited in their briefs. Attention is called to *Taylor* v. *City of Ypsilanti*, 105 U. S. 60, in which it was said:

" In 1859 the legislature of Michigan passed an act providing for the payment from the State treasury of a certain sum, by way of bounty, for every bushel of salt manufactured by any individual, company, or corporation, from water obtained by boring in Michigan, and exempting from taxation property used for such purposes. Laws Mich. 1859, p. 551. That law was subsequently amended, and in *People* v. *Board of State Auditors* (decided in 1861), 9 Mich. 327, it was held that the relator, a manufacturing company, acquired a vested right to the amount offered by the original act for all salt manufactured prior to the amendatory statute reducing the bounty. And the doctrines of that case were reaffirmed in *East Saginaw Manfg. Co.* v. *City of East Saginaw* (decided in 1869), 19 Mich. 259 (2 Am. Rep. 82), after the passage of the act of March 22, 1869. The diligence of counsel, aided by our own researches, has not disclosed any adjudication of the Supreme Court of Michigan prior to May 26, 1870, in which the doctrine of these cases was recalled."

From an examination of the cases referred to in the above opinion in this court, it is evident that the constitutionality of the salt-bounty act was not raised or passed upon. In the first case a *mandamus* was asked to compel the board of State auditors to allow a claim under the original act, as the board had refused payment on the ground that a subsequent act repealed the former one.

In the second case a bill had been filed to restrain the collection of the taxes levied upon the property of complainant (the salt manufacturing company) invested in the business of manufacturing salt. The ground for filing the bill was that the statute in force when the complainant commenced its manufacture exempted from taxation the property employed for that purpose; and complainant insisted that this statute was a contract between itself and the State, and was irrepealable. The court held, however, that the statute was nothing but a bounty law, and as such might be repealed at any time. On error this was affirmed by the Supreme Court of the United States. *East Saginaw Salt Manfg. Co.* v. *City of East Saginaw,* 13 Wall. 373.

We think the present case comes squarely within the reasoning of this court in *People* v. *Township Board of Salem,* 20 Mich. 452 (4 Am. Rep. 400). In that case the question was the constitutionality of an act permitting certain townships to issue bonds in aid of the construction of a railroad. It was said by Mr. Justice COOLEY, beginning at page 486:

"But it is not in the power of the State, in my opinion, under the name of a bounty, or under any other cover or subterfuge, to furnish the capital to set private parties up in any kind of business, or to subsidize their business after they have entered upon it. A bounty law of which this is the real nature is void, whatever may be the pretense on which it may be enacted. The right to hold out pecuniary inducements to the faithful performance of public duty in dangerous or responsible positions stands upon a different footing altogether. Nor have I any occasion to question the right to pay rewards for the destruction of wild beasts and other public pests; a provision of this character being a mere police regulation. But the discrimination by the State between different classes of occupations, and the favoring of one at the expense of the rest, whether that one be farming or banking, merchandising or milling, printing or railroading, is not legitimate legislation, and is an invasion of that equality of right and privilege which is a maxim in State government. When the door is once opened to it, there is no line at which we can stop,

and say with confidence that thus far we may go with safety and propriety, but no farther. Every honest employment is honorable; it is beneficial to the public; it deserves encouragement. The more successful we can make it, the more does it generally subserve the public good. But it is not the business of the State to make discriminations in favor of one class against another, or in favor of one employment against another. The State can have no favorites. Its business is to protect the industry of all, and to give all the benefit of equal laws. It cannot compel an unwilling minority to submit to taxation in order that it may keep upon its feet any business that cannot stand alone. Moreover, it is not a weak interest only that can give plausible reasons for public aid. When the State once enters upon the business of subsidies, we shall not fail to discover that the strong and powerful interests are those most likely to control legislation, and that the weaker will be taxed to enhance the profits of the stronger. I shall not question the right of the people, by their Constitution, to open the door to such discriminations; but in this State they have not adopted that policy, and they have not authorized any department of the government to adopt it for them."

On page 495 of the case it was said by Justice CAMP-BELL:

"It has been said to be too clear to need argument that it would be usurpation, and not legislation, to take the property of A. and give it to B. It must be on the same ground equally illegal to tax A. for the benefit of B.; for the amount of property taken against his will cannot make any difference in the principle; neither can it make the wrong any less that he has companions in misery. Taxation for private purposes is no more legal than robbery for private purposes. And where an enterprise is conducted by private persons for their own private benefit, the public authorities having no control over the expenditure, and no share in the profits, it is a private enterprise, and not a public one, whether large or small, and whether profitable or unprofitable. No enterprise can be properly regarded as a public enterprise in which the public has no voice. For the expenditure of public money the Constitution and laws provide public officers, and put them under adequate control and security. The money of the people belongs in the custody of the agents of the people. Governments

cannot delegate public responsibilities to private and irresponsible hands."

These views have been affirmed and reaffirmed by this court: *People* v. *State Treasurer*, 23 Mich. 499; *Anderson* v. *Hill*, 54 Mich. 477 (20 N. W. 549); *Davis* v. *Board of Sup'rs*, 64 Mich. 404 (31 N. W. 405); *Dodge* v. *Van Buren Circuit Judge*, 118 Mich. 189 (76 N. W. 315); *Attorney General* v. *Pingree*, 120 Mich. 550 (79 N. W. 814).

The first contention of counsel for relator has no more substantial foundation than the other. The act of 1897 is unconstitutional and void; and yet counsel contend that, though this be found, under the act of 1899 it is entitled to the bounty there appropriated. Counsel cite, in support of this proposition, the case of *U. S.* v. *Realty Co.*, 163 U. S. 427 (16 Sup. Ct. 1120). The question there raised was entirely different from the question here. Here no specific appropriations were made by the act of 1899 by which the sugar bounties could be paid, and the legislature has not recognized the relator's claim. But it has been held several times in this State that an unconstitutional statute is a statute only in form, and lacks the force of law, and is of no more saving effect to justify action under it than as though it had never been enacted. *Mason* v. *Perkins*, 73 Mich. 303 (41 N. W. 426); *Adsit* v. *Osmun*, 84 Mich. 420 (48 N. W. 31, 11 L. R. A. 534).

The writ of *mandamus* must be denied.

The other Justices concurred.