DETROIT MUSEUM OF ART *v.* ENGEL.

CONSTITUTIONAL LAW—DETROIT MUSEUM OF ART—PRIVATE PURPOSE —TAXATION—MANDAMUS.

Act No. 489, Local Acts 1903, empowering the city of Detroit to appropriate public funds for the support and maintenance of the Detroit Museum of Art, a private corporation, is in conflict with Art. VIII, § 25, and Art. X, § 12, of the State Constitution, in appropriating public money for a private purpose, and the facts that said museum of art has a public purpose, that the city of Detroit has title to its property, and that the city has a minority representation on its board of directors, are insufficient to change its nature from a private corporation to a municipal agency, and the action of the circuit judge in granting a writ of mandamus to enforce the provisions of the act is reversed.  BROOKE, C. J., and MOORE, J., dissenting.

Certiorari to Wayne; Van Zile, J.   Submitted Janu-

ary 12, 1915. (Calendar No. 26,570.) Decided July 23, 1915. Rehearing denied April 21, 1916.

Mandamus by the Detroit Museum of Art and another against George Engel, controller of the city of Detroit, to compel respondent to sign a voucher to pay the salary of the acting director of relator from public funds. An order granting the writ is reviewed by respondent on certiorari. Reversed.

*Stevenson, Carpenter, Butzel & Backus* (*William L. Carpenter,* of counsel), for relators.

*Richard I. Lawson,* for respondent.

MOORE, J. (*dissenting*). In the spring of 1885, 40 residents of the city of Detroit, each of whom had contributed $1,000, organized the Detroit Museum of Art. That organization was made under Act No. 3 Pub. Acts 1885, entitled "An act for the formation of corporations for the cultivation of art." Some of the provisions of the act read:

"Such corporations shall have power to acquire and hold such real estate as is suitable for the site of such art buildings as it may erect or maintain thereon, to receive and use such gifts, contributions, devises, and bequests as may be made to it for art purposes; to receive, acquire, collect, and own paintings, sculpture, engravings, drawings, pictures, coins, and other works of art, and to institute, maintain, or assist schools for the teaching of art.

"The public exhibition of its collection of works of art shall be the duty of every such corporation, and, as soon as it shall be prepared to do so, it shall, under reasonable regulations, and without any improper discriminations, open its buildings and art collection to the general public.

"Any person who shall contribute to any such corporation, in money or property, one thousand dollars, or more, shall be a member thereof. * * *

"The affairs of said corporation shall be managed by

a board of trustees, the number of which shall be regulated by by-law, but in no case shall the number be less than four, nor more than sixteen. Three-fourths of said trustees shall be elected by the members of the corporation, from their own number. The other one-fourth of such trustees shall be appointed from resident free-holders, by the board of aldermen of the city where such corporation is situated, upon the nomination of the mayor. *  *  *

"The president and trustees shall serve without compensation. *  *  *

"All gifts, devises, or bequests made to any such corporation, and all its income, shall be faithfully used for the purposes for which such corporation was organized; and no dividend in money or property shall ever be made by such corporation among its members.

"The character and purposes of such corporation shall not be changed, nor its general art collection be sold, incumbered, or disposed of, unless authorized by the legislature of this State upon the concurrent request of said corporation, and of the mayor and board of aldermen of the city in which it is situated."

The articles of incorporation were filed on the 16th day of April, 1885, and in them it is provided with a life of 30 years. In the year 1899 (Act No. 429, Local Acts 1899) the legislature by an amendment to the charter of the city of Detroit empowered the common council to appropriate each year for the support of the Detroit Museum of Art a sum not to exceed $20,000 in any one year, and appropriations were made under this provision. In the year 1903 the Detroit charter was amended so as to read as follows (chap. 7, § 66):

"Sec. 66. The common council shall also have power to appropriate each year for the support of the Detroit Museum of Art, such sum not exceeding twenty thousand dollars in any one year as it may deem necessary, which sum shall be paid from the general fund: Provided, however, such appropriation shall be made upon the express condition that admittance to said museum shall be free to the public at all times, subject to such reasonable regulations as to the hours as the board of trustees of said Detroit Museum of Art may establish.

The common council shall also have power to appro-
priate from time to time such sums as is necessary for
the purpose of erecting an additional building or build-
ings for the Detroit Museum of Art, which sums shall
be paid from the general fund. The common council
shall also have power, with the approval of the board
of estimates, for the purpose of erecting such addi-
tional building or buildings for said museum of art
to borrow upon the best terms it can make and for
such time as it shall deem expedient, such sums of
money as it shall deem necessary, not exceeding the
sum of fifty thousand dollars, and shall have authority
to issue bonds pledging the faith and credit of said
city for the payment of the principal and interest of
said bonds, which bonds shall be denominated 'Detroit
Museum of Art Bonds,' of the city of Detroit and shall
bear interest not exceeding four per cent. per annum."
Act No. 489 Local Acts 1903.

In 1904 a $50,000 bond issue was authorized by the
common council and approved by the board of esti-
mates in accordance with Local Act No. 489. Man-
damus proceedings were instituted in the Wayne cir-
cuit court to test the validity of said bond issue, and
Judge Mandell sustained said act and held the bonds
valid. This decision was never reviewed. The bonds
were issued and with the proceeds additional buildings
were erected. Before these bonds were issued the city
of Detroit and the Detroit Museum of Art entered
into an agreement by which the museum building and
real estate then owned by said relator were conveyed
to the city of Detroit upon the conditions in the agree-
ment contained. The control of the institution was
continued in the hands of the board of trustees of the
museum of art, but admittance to the museum from
then until now has been free to the public.

From 1899 until now the city of Detroit has made
an appropriation each year for the maintenance of
the museum. The form of the appropriation for the
year commencing July 1, 1914, and ending June 30,
1915, is shown by the following quotation from the

report of the board of estimates, which was subsequently adopted by the common council:

"Resolved, that the estimates for the maintenance of the several municipal departments of the city of Detroit for the fiscal year ending June 30, 1915, be and are hereby allowed for the purposes and in the amounts as hereinbelow specifically set forth:

"Art Museum—Maintenance.

| | |
|---|---|
| "Acting director | $3,000 00 |
| One librarian | 1,100 00 |
| Two custodians, at $1,000 | 2,000 00 |
| Three janitors, at $720 | 2,160 00 |
| One engineer | 780 00 |
| One watchman | 720 00 |
| One stenographer | 720 00 |
| Repairs and improvements | 1,000 00 |
| General expense | 2,500 00 |
| Printing | 700 00 |
| Fuel | 600 00 |
| Postage | 200 00 |
| Library | 200 00 |
| Exhibitions | 2,000 00 |
| Purchase additions to museum collection | 1,000 00" |

Mr. Burroughs is acting director of the museum of art. His duties are in part as follows:

The director of the museum shall be the chief executive officer thereof. He shall in person or by assistant have direct charge of the museum and administration of same, subject to such limitations or restrictions as the board may impose. He shall execute the orders of the board or its committees. He shall submit to the board, or the proper committees, such plans as in his judgment will make the museum more efficient and such methods as may seem to him improvements upon those in use.

December 19, 1914, Mr. Burroughs presented a voucher, duly verified under oath, for his salary for one-half month to the controller of Detroit, and demanded a warrant upon the city treasury of Detroit for the sum of $125 in payment of his services for the

one-half month ending December 15, 1914. Upon the advice of the corporation counsel of the city of Detroit the controller refused to pay the salary of Mr. Burroughs. The circuit court issued a mandamus, directing the controller to pay Mr. Burroughs' salary. This is certiorari to review that action.

The city attorney assigns seven reasons for saying that Act No. 489 of the Local Acts of 1903 is unconstitutional. These can all be discussed under two heads, viz.:

1. It is the use of public funds for a private purpose.

2. It is a violation of section 12, art. 10, of the Michigan Constitution of 1908 reading:

"The credit of the State shall not be granted to, nor in aid of, any person, association or corporation, public or private" (citing *People* v. *Township Board of Salem,* 20 Mich. 452 [4 Am. Rep. 400] ; *People, ex rel. Bay City,* v. *State Treasurer,* 23 Mich. 499; *Dodge* v. *Circuit Judge,* 118 Mich. 189, 190 [76 N. W. 315] ; *Michigan Sugar Co.* v. *Auditor General,* 124 Mich. 674 [83 N. W. 625, 56 L. R. A. 329, 83 Am. St. Rep. 354] ; *State, ex rel. Board of Control,* v. *City of St. Louis,* 216 Mo. 47 [115 S. W. 534] ; *Citizens' Savings, etc., Association* v. *Topeka City,* 87 U. S. [20 Wall.] 655; *Cole* v. *City of La Grange,* 113 U. S. 1 [5 Sup. Ct. 416] ; *St. Mary's Industrial School for Boys* v. *Brown,* 45 Md. 310; *Curtis's Administrator* v. *Whipple,* 24 Wis. 350 [1 Am. Rep. 187] ; *State, ex rel. Garth,* v *Switzler,* 143 Mo. 287 [45 S. W. 245, 40 L. R. A. 280, 65 Am. St. Rep. 653] ).

The first three of the Michigan cases relate to attempts to use public funds in aid of railroads owned by their stockholders. The fourth Michigan case relates to an attempt to use public funds for the benefit of those growing sugar beets. Clearly these cases are not controlling.

It is said by the city attorney that the case of *State, ex rel. Board of Control,* v. *City of St. Louis, supra,* is on all fours with the instant case. An examination of

the case will show that in many respects it resembles the instant case. The proceeding was mandamus to compel the authorities of the city of St. Louis to turn over to the St. Louis School and Museum of Fine Arts —a department of Washington University—upon its vouchers money which had been raised by taxation for the support of that museum. The case is unlike the instant case because of a provision in the Constitution of Missouri (section 6, art. 9), which reads that:

"No other county, township, city or other municipality shall hereafter become a subscriber to the capital stock of any railroad or other corporation or association, or make appropriation or donation, or loan its credit to or in aid of any such corporation or association, or to or in aid of any college or institution of learning or other institution, whether created for or to be controlled by the State or others."

The conclusion of the opinion reads:

"Learned counsel for relator has filed a most elaborate brief to demonstrate that the Art Museum is a public use, and the right and power of the city to act as trustee to such trust, and, without controverting any of the propositions involved in that discussion, the conclusion at which we have arrived that the relator is but a subsidiary agency of Washington University, * * * and that the tax for which relator sues in this case * * * is, after all, but a donation to Washington University for its department of art, * * * forbids us to review the great number of cases collected. * * * In our opinion the tax fund * * * is but a donation to Washington University, a private corporation, and to that extent it is in violation of the Constitution of this State and the provisions thereof, which have hereinbefore been set forth at length."

The cases in 87 U. S. and 113 U. S. were efforts to use public funds in aid of private manufacturing plants. Without analyzing in detail the other cases, it may be said of them that they are easily distinguishable from the instant case.

In the case before us it was provided in the original act that the trustee should serve without pay, that no dividend in money or property should ever be made among the members of the corporation, and that its property could not be alienated unless authorized by the legislature upon the concurrent request of the corporation and of the mayor and board of aldermen. It is also provided that one-fourth of the trustees should be appointed by the board of aldermen, and from the beginning it was provided that without any improper discriminations the art collection should be open to the general public. For years the city of Detroit has owned the building in which the art collection is housed, and the management, since the bond issue mentioned, is bound to admit, and does admit, free of charge the public to the art exhibits. We think it clear that the purposes are public and not private.

The authority conferred upon the council to make the appropriation is permissive, and the council may surround the appropriation with such safeguards, if any more are needed, as are reasonable and proper. In the instant case the appropriation was passed upon by the board of estimates and the common council, and was within their powers. The controller should issue the warrant as prayed.

The writ of certiorari should be dismissed, and the judgment should be affirmed.

BROOKE, C. J., concurred with MOORE, J.

BIRD, J. The conclusion reached by Mr. Justice MOORE in this case, in my opinion, infringes the constitutional provisions that:

"The credit of the State shall not be granted to, nor in aid of any person, association or corporation, public or private." Art. 10, sec. 12.

"No city or village shall have power * * * to loan its credit, nor to assess, levy or collect any tax

or assessment for other than a public purpose." Art. 8, sec. 25.

Mr. Justice MOORE appears to have been moved in the main to his conclusion in this case by the existence of three facts, namely: *First,* that the object of the corporation is a public one; *second,* that the city has the title to the property; *third,* that the city has a representation on the board.

It is conceded that the Detroit Museum of Art was incorporated as a private corporation, and it must be conceded that it is now a private corporation, unless its organization has been changed. It has surrendered its real property to the city and granted to it a minority representation on the board of directors, but it is still managed by a private board of directors. Then just how and when was the character of this corporation changed, so that it could be the lawful recipient of public funds? It is said that its object is a public one. Grant that this is so, the change cannot be ascribed to this fact, as its object now is the same as it was when it was first organized. It is of no importance how public the aims and purposes of the corporation may be, unless it takes on the form of a municipal agency, it is still under the ban of the constitutional inhibition.

It is also urged that the city has title to the real estate heretofore owned by the corporation. The fact that a private corporation has divested itself of its property does not change its character as a private corporation. To be sure, its resources are lessened but its privileges and franchises remain the same. Neither does the fact that the property has vested in the city work any change in it. The transfer simply operates as a security to the city, and makes it less probable that the assistance rendered by it will be in vain. If a conveyance of some or all of its property to the city converts this private corporation into a

municipal agency, there would seem to be no good reason why the corporation which owns the Detroit Opera House might not follow the example of relator, and receive aid in the same way.

Another argument in behalf of relator is that the city has representation on the board. The representation which the city is given upon the board is a minority representation, and does not carry with it control of its affairs. The city has no power to remove the manager if it shall conclude he is dishonest or incompetent; neither has it the power to enforce the appointment of any particular person as manager if that position were vacant. If some lover of art should donate $100,000 to relator, would the city have any voice in its expenditure or investment? And if any portion of it were embezzled, could the wrongdoer be prosecuted under the statutes provided for the punishment of public officials? It may be said that this control could be brought about in part indirectly by coercion by withholding future appropriations, but that hardly answers the point that the city has no such control as it can enforce in the courts.

The same rule of construction should apply in this case that has been applied to the many attempts made by municipalities in this State to aid railroad and industrial projects. *People* v. *Salem,* 20 Mich. 452 (4 Am. Rep. 400) ; *People, ex rel. Bay City,* v. *State Treasurer,* 23 Mich. 499; *Dodge* v. *Circuit Judge,* 118 Mich. 189 (76 N. W. 315) ; *Michigan Sugar Co.* v. *Auditor General,* 124 Mich. 674 (83 N. W. 625, 56 L. R. A. 329, 83 Am. St. Rep. 354) ; *Michigan Corn, etc., Association* v. *Auditor General,* 150 Mich. 69 (113 N. W. 582).

The case at bar does not differ in principle, but only in degree, from the cases cited. The act creating this corporation was very cleverly devised to diminish the objections which were raised in those cases, and which might be raised under this constitutional provision,

but the fact still remains that it is a private corporation. A similar attempt was made in St. Louis, Mo., to extend public aid to an art museum under similar conditions, and one of the claims of the relator there was that:

"The said St. Louis School and Museum of Fine Arts is established, regulated, and conducted in the same manner and upon the same general plan and scheme as are all of the art museums of the world, and particularly the art museums in the cities of New York, Buffalo, Chicago, Cincinnati, Cleveland, Detroit," etc.

But the courts of that State withheld their sanction on the ground that money could not be legally collected as taxes and turned over to a private corporation to disburse. *State, ex rel. Board of Control*, v. *City of St. Louis*, 216 Mo. 47 (115 S. W. 534). A like conclusion was reached under similar constitutional provisions in the case of *St. Mary's Industrial School for Boys* v. *Brown*, 45 Md. 310. Every argument made in behalf of relators in the case at bar is answered in those cases adversely to their contention.

The object and purpose of relator is a public purpose in the sense that it is being conducted for the public benefit, but it is not a public purpose within the meaning of our taxing laws, unless it is managed and controlled by the public. As matters now stand, the people who are called upon to pay the taxes and furnish the money have no voice in the selection of the servants of relator; neither have they any voice in the selection of a majority of the board of directors who control and manage its affairs. It was said by Mr. Justice CAMPBELL that:

"Taxes and loans, when authorized to be raised by any public body, must be raised under the implied condition that they are to be applied to the public uses under the control or care of that body." *Attorney General* v. *Board of Supervisors*, 34 Mich. 46.

This has always been the policy of our law, and no instance has been pointed out where one other than a public official, either by election or appointment, has had charge of the disbursement of public funds.

Had this court been called upon to pass upon this question before the corporation transferred its property to the city and gave it a representation on the board, it probably would have found little difficulty in denying the writ upon constitutional grounds. What the relator has since done has made no material change in its character as a private corporation. It has not thereby been changed from a private corporation to a municipal agency. The most that can be said of the situation, as counsel for the respondent suggests, is that immunity from the constitutional provision is claimed upon the ground that the city has gone into partnership with a private corporation. In other words, if the State has no interest in a private corporation, granting it aid would be in violation of the Constitution. If it has some interest, however slight, the constitutional inhibition does not apply. And right here the great danger lies. If we are to say that this constitutional safeguard against an improper use of public money is to be sailed around by a private corporation conveying to the municipality a part or all of its property, and giving it a minority representation on its board, then that provision will be of little use in the future in protecting the people against reckless and extravagant use of public funds. I am of the opinion that the writ should be denied, and the case is reversed.

KUHN, STONE, OSTRANDER, and STEERE, JJ., concurred with BIRD, J.

The late Justice MCALVAY took no part in this decision.